NO. 4-08-0036          Filed 12/19/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
|      Plaintiff-Appellee, | ) | Circuit Court of |
|      v. | ) | Champaign County |
| CORNELIUS M. TAPSCOTT, | ) | No. 06CF212 |
|      Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

_____

JUSTICE MYERSCOUGH delivered the opinion of the court:

In May 2006, defendant, Cornelius M. Tapscott, pleaded guilty to criminal sexual assault (720 ILCS 5/12-13(a)(2) (West 2004)). He was sentenced to 15 years in the Department of Corrections (DOC) with 96 days' sentence credit. Defendant appealed his conviction and sentence. This court remanded the cause because defense counsel's certificate was not in compliance with Supreme Court Rule 604(d) (210 Ill. 2d R. 604(d)). People v. Tapscott, No. 4-06-0680 (July 30, 2007) (unpublished order under Supreme Court Rule 23). Defendant now appeals on the following grounds: (1) the trial court's failure to sua sponte conduct a fitness hearing and (2) alternatively, ineffective assistance of counsel for counsel's failure to request a fitness hearing. We affirm.

I. BACKGROUND

In January 2006, the State charged defendant by infor-

mation with two counts of aggravated criminal sexual assault. Count I alleged that defendant committed the Class X felony of aggravated criminal sexual assault when, with the threat of the use of force, he placed his penis in the sex organ of the victim while he was armed with a firearm (720 ILCS 5/12-14(a)(8), (d) (West 2004). Count II alleged that defendant committed the Class X felony of aggravated criminal sexual assault when, with the threat of the use of force, he placed his penis in the sex organ of the victim while threatening the victim in such a way as to believe under the circumstances he was utilizing a dangerous weapon (720 ILCS 5/12-14(a)(1), (d) (West 2004)). In February 2006, the grand jury returned a two-count indictment charging defendant with the identical counts of aggravated criminal sexual assault.

On April 6, 2006, the State charged defendant by information with the Class 1 felony of criminal sexual assault (720 ILCS 5/12-13(a)(2), (b) (West 2004)) (count III). That same day, defendant filed a jury waiver.

On April 7, 2006, the parties appeared for a guilty plea hearing. The trial court advised defendant that the State filed an additional count (count III) charging him with criminal sexual assault. The court explained the new charge stated that defendant committed an act of sexual penetration on the victim by placing his penis in the vagina of the victim knowing that she

- 2 -

was unable to give knowing consent. Defendant advised the court he understood the charge. The court further admonished defendant that this was a Class 1 felony with a minimum sentence of 4 years and a maximum sentence of 15 years, followed by a period of mandatory supervised release of 2 years. Defendant advised the court he understood the potential penalties. When asked, defendant indicated his intention to plead guilty.

The trial court further admonished defendant as follows:

"THE COURT: Now, [defendant], when you come in to court and offer to plead guilty, that means you're going to give up some rights.

You have an absolute right to a trial on this charge and that would either be a trial in front of a judge or a trial in front of a jury.

But when you come in to court and offer to plead guilty, that means you're going to give up your right to a trial and we're not going to have a trial of any kind; you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: If we were going to have a

trial, the State would have to prove you guilty beyond a reasonable doubt before you could be convicted.  You understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And as you sit there now, you can still plead not guilty and demand a trial.  You understand that?

THE DEFENDANT: Yes sir.

THE COURT: Again, if there was a trial in your case, you would have a right to hear the witnesses testify.  They'd sit there in the witness chair and they would testify in open court.  You could sit there and listen to what they had to say and then you could ask them questions about what they had said through your lawyer.  That's called cross-examination.

You could call witnesses at your trial if you wanted.  And you could testify at your trial if you wanted.  But if you did not want to testify at your trial, no one could make you do that if you didn't want to.  You understand that?

THE DEFENDANT: Yes, sir.

THE COURT: So, you understand that when you plead guilty, that means you're going to give up your right to a trial and we won't have a trial of any kind; you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Now, is your plea of guilty today voluntary? Is this of your own free will?

THE DEFENDANT: Yes, sir."

The State advised that in exchange for defendant's guilty plea to count III, the State would move to dismiss counts I and II as well as another pending felony case. The agreement did not include any sentencing recommendation. The trial court advised defendant as follows:

"THE COURT: [Defendant], as I understand the situation, we're going to continue this matter for a sentencing hearing. And at that sentencing hearing, [c]ounts I and II are going to be dismissed, as well as the other felony matter. And your penalty range will be anything from somewhere between 4 and 15 years in prison.

Is that your understanding of where we

are right now?

THE DEFENDANT: Yes, sir.

THE COURT: Has anyone promised you any-thing else to get you to plead guilty?

THE DEFENDANT: No sir,

THE COURT: Has anyone forced you or threatened you?

THE DEFENDANT: No sir."

The factual basis indicated the evidence would show that on April 25, 2005, the 16-year-old victim was at a home in Champaign, Illinois, with some friends, during which time she consumed both cannabis and alcohol. Sometime later that night, defendant sexually penetrated the victim. Deoxyribonucleic acid (DNA) from the victim later confirmed defendant's sexual penetration of her.

Defendant persisted in his guilty plea. The trial court found the plea to be knowing and voluntary, without coercion or threats, and that a factual basis was stated for the plea. The court set the matter over for sentencing.

The presentence investigation (PSI) report filed in May 2006 reflected that defendant was 20 years old, unmarried, with a child due in July 2006. Defendant had a prior juvenile and adult criminal history. The juvenile history included adjudication for three separate thefts, two of which were committed while defen-

dant was on conditional discharge for the first theft. His conditional discharge was revoked, and he was resentenced to 24 months' probation. While on probation, two petitions for finding of indirect criminal contempt were filed alleging curfew violations. Defendant was ultimately sentenced to serve time in the youth detention center and the county jail. Defendant later stipulated to a delinquency petition alleging aggravated battery. He was sentenced to DOC, Juvenile Division.

Defendant's adult history included an October 2003 battery, for which defendant was sentenced to conditional discharge; an August 2004 disorderly conduct, for which defendant was sentenced to conditional discharge; and a September 2004 domestic battery, for which he was sentenced to 18 months' probation. A petition to revoke was filed in March 2005 that alleged defendant attempted to destroy a drug-test sample. Disposition of the revocation proceedings was pending when the PSI report was filed. The report reflected that defendant had not complied with several other conditions of probation. While on probation, defendant committed the instant offense in April 2005 and was charged with theft in July 2005, resisting a peace officer in September 2005, and attempt (murder) and aggravated discharge of a firearm in November 2005. Defendant also had several traffic offenses.

The PSI report reflected that defendant graduated from

high school by meeting the requirements of a special-education student. Defendant had received special-education services since kindergarten. The report reflected that defendant's reading abilities are limited. He is able to print but cannot write in cursive.

The PSI report further reflected that numerous mental health and/or psychological evaluations had been completed on defendant between 1992 and 2001. These were performed at the request of the public school programs, the Illinois Department of Children and Family Services (DCFS), and DOC. Various social-service agencies had offered defendant counseling over the years. Throughout his youth, he had also been prescribed various medications to address mental-health disorders, including intermittent explosive disorder, conduct disorder, attention deficit hyperactivity disorder (ADHD), and probable post-traumatic stress disorder. These medications included Ritalin, Tegretol, clonodine, Haldol, and Prozac.

Attached to the PSI report was a psychological assessment report performed on defendant by the University of Illinois (U of I) when defendant was 16 years old. The report reflected that defendant's father was not involved in his life and that he had at various times been separated from his mother because of DCFS intervention. Defendant attended various schools mainly due to behavioral problems. He finished his education at Cunningham

Children's Home's Circle Academy as a nonresident. While at Circle Academy, defendant's behavior and schoolwork improved significantly. Defendant developed a strong personal relationship with teachers and staff at Circle Academy. Defendant's emotional and cognitive problems interfered with his schoolwork and his social skills because he socially functioned well below his peers. Further, defendant was seen as a person who was easily persuaded by his peers. He was not someone who would decide on his own to harm another.

The U of I report reflected that throughout his life defendant had been subjected to various tests to assess his intelligence quotient (IQ). In 1991, defendant's full-scale IQ was 83, placing him in the "slow[-]learner range of intelligence." In 1995, defendant again was determined to have a full-scale IQ of 83. In 1997, defendant's full-scale IQ was 70, placing him in the "mild[-]mental[-]retardation range." In 1998, defendant showed a full-scale IQ of 65, placing him in the "mildly mentally impaired range." In 1999, defendant's full-scale IQ was 59, in the "mentally deficient range." However, the examiner noted that defendant "tended to give up easily, and answer 'I don't know' to questions before really trying." When the U of I examiner tested defendant's IQ, his full-scale IQ was 63, in the "deficient range of intelligence."

At the May 2006 sentencing hearing, the State presented

the testimony of Lisa Staples, a detective with the Champaign police department. Staples testified that she conducted a follow-up investigation of the sexual assault which is the subject matter of this appeal. Staples interviewed the 16-year-old victim, Katie, approximately a week after the assault. Katie advised Staples that she had been at a party at a house in Champaign. She had been drinking and smoking cannabis. While at the party, Katie had physical contact with another individual. Katie left the party in a car with two other people but ended up getting out of the car because the female in the car was prostituting herself and Katie wanted no part of that. The hour was around midnight or 1 a.m. Katie was walking along the street trying to find a friend's house. As Katie was walking down Bradley Street, she was approached by a subject wearing a hooded sweatshirt. He started making sexual comments to her. Katie told the man she was not interested. The man grabbed Katie and stuck what she thought was a black gun in her left side. He led her behind a house. He told Katie he wanted her to perform oral sex on him or he would shoot her in the head. Katie told the man she did not know how. The man told Katie to remove her pants. She complied by taking one leg out of her pants and underwear. At the man's direction, Katie laid down on the ground. The man forcibly sexually assaulted her. During the interview, Katie demonstrated for Staples how the man was on top of her during the

assault and had the gun in his left hand pointed at her head while he rested on his elbow. Katie was unable to identify her assailant. The gun was never located.

Before Staples interviewed Katie, Katie had been taken to the hospital where a rape kit was performed. The vaginal swab revealed male, human DNA. Several months later, the DNA retrieved in the rape kit was run through the Combined DNA Index System (CODIS). It matched defendant's DNA.

The State also called Mark Strzesak, a detective with the Champaign police department. Strzesak testified about a November 2005 shooting incident in which defendant was implicated as the shooter. The victim stated he believed the gun used was a black .38-caliber revolver. The gun was never recovered. Defendant was charged with attempt (murder), but ultimately the charge was dismissed as part of the plea agreement in the instant case.

Defendant called Linda Fox, a special-education teacher at Gerber School in Urbana. Fox was defendant's one-on-one assistant starting in 1995 when defendant was 10 years old, and she continued with him in some capacity until he graduated in 2005. Fox and her husband were also defendant's mentors. They invited him into their home and took him on family vacations. Other teachers also took defendant into their homes and essentially were his mentors. Fox had not seen violence in defendant.

Fox also described defendant as a follower who was easily persuaded by others because of his low level of intellectual functioning.

Fox testified that in 1995, defendant was very introverted and extremely depressed. Defendant was unable to read and had difficulties with math. Defendant was subaverage in terms of general intellectual functioning, which was reflected in his delayed maturity, reduced learning ability, and inadequate social adjustments. Defendant worked best in a structured environment with clear expectations. He loved school so much that he actually sabotaged his graduation. Consequently, Fox had to wait to tell defendant he completed his requirements to graduate until a point in time when he could not sabotage it. In the 10 years Fox knew defendant, she saw improvements in his ability to follow rules and verbal instructions. He improved his ability to understand what people asked him to do, which Fox believed was due to his improved reading and conversational abilities.

The trial court stated it considered the PSI report, documentation prepared and presented on defendant's behalf, statutory factors in aggravation and mitigation, comments of counsel, and defendant's written comments. The court found applicable the statutory factor in mitigation that defendant was mildly mentally impaired. Nonstatutory factors in mitigation the court found applicable were defendant's age (20) and that defen-

dant pleaded guilty to the offense. The court found statutory factors in aggravation included defendant's prior juvenile and adult history of criminal convictions and the need for deterrence. The court noted that this was a deterrable offense.

The trial court remarked about the resources and efforts expended on defendant's behalf to assist him in leading a law-abiding life. However, despite those efforts, defendant continued his criminal conduct into adulthood, including many violent offenses. The court observed that ultimately defendant could not be relieved of responsibility for his criminal conduct. The court commented that defendant's record demonstrated that he is a dangerous individual for whom a sentence must be fashioned that protects society and that provides appropriate deterrence for defendant and others similarly situated. The court sentenced defendant to 15 years in DOC with 96 days of sentence credit.

On May 16, 2006, defense counsel filed a motion to reconsider the sentence. Defendant subsequently sent a letter to the trial court indicating that he wanted to withdraw his guilty plea. In June 2006, defendant also filed a pro se motion to withdraw his guilty plea, arguing ineffective assistance of counsel. In June 2006, the court appointed new counsel to represent defendant. In August 2006, newly appointed counsel filed a motion to withdraw guilty plea, arguing that defense counsel was ineffective for failing to (1) provide defendant with

ample time to discuss with his attorney the ramifications and consequences of the plea; (2) investigate the case; or (3) file a motion for substitution of judge, which defendant requested him to do. The motion further stated that defendant felt forced to take the plea and did not voluntarily waive his right to trial.

In August 2006, the trial court held a hearing to address the motion to withdraw plea and motion to reconsider sentence. As to the motion to withdraw plea, defendant testified that when he pleaded guilty he was represented by public defender Randy Rosenbaum. Defendant maintained that prior to his plea, he spoke to Rosenbaum only two times regarding all of his pending cases. Defendant testified that during those conversations Rosenbaum told defendant that he was going to get defendant the minimum sentence of four years if he pleaded guilty to the Class 1 felony of criminal sexual assault.

Defendant testified that he wanted Rosenbaum to file a motion for substitution of judge because he felt there would be a conflict of interest with Judge Difanis. Rosenbaum never filed the motion for substitution. Defendant asked Rosenbaum to investigate the sexual-assault case and to interview certain witnesses. Defendant maintained that Rosenbaum had not investigated the case to his satisfaction or interviewed witnesses in preparation for trial.

Asked if, when the trial court went over his rights, he

understood the rights he was giving up when he pleaded guilty, defendant responded, "[n]ot all of them." When asked to be more specific, defendant responded, "I said I really don't remember most of them." Counsel asked defendant why he told the court he understood his rights. Defendant responded, "I had--just had too much stuff on my mind." He said he was not thinking clearly. Defendant denied being under the influence of alcohol, drugs, or any other medications at the time.

Defendant stated that as far as his plea being voluntary, he felt under a certain amount of stress and, to a certain extent, forced to plead guilty. When asked to explain why, defendant responded, "[d]epressed." Defendant stated that he was in custody at the time of his plea but he had not sought out any services or medication for his depression. He talked to a couple of mental-health staff. When asked what sort of stress was placed on him that affected his ability to voluntarily plead guilty, defendant responded, "I thought I was gonna get four years." Defendant further indicated that the other pending cases and the amount of time he was looking at put undue stress on him.

On cross-examination, defendant acknowledged that when Rosenbaum represented him he had pending an attempt (murder) case as well as the sexual-assault case. Defendant acknowledged that Rosenbaum discussed with him the potential prison time he would serve if he was convicted of both crimes. He agreed he was

looking at the potential of serving considerable time, i.e., up to 40 years consecutive. Defendant stated that he and Rosenbaum discussed the plea agreement before he entered into the negotiated plea where the State dismissed the attempt (murder) charge. Defendant acknowledged that he understood the negotiated plea would result in him facing a lot less than 40 years in prison. He further acknowledged he discussed that with Rosenbaum. When asked if he voluntarily entered into that agreement, defendant responded that he entered into the plea because he was under stress because he thought he was going to get four years. Defendant acknowledged that he understood when he entered into the plea agreement that there was still going to be a sentencing hearing where the judge would decide the sentence. When asked if he voluntarily waived trial and agreed to enter into the plea, defendant responded, "[y]es."

Rosenbaum testified in relevant part that he was appointed to represent defendant on three pending cases: possession of a stolen vehicle, the instant sex offense, and attempt (murder). Rosenbaum's notes reflected that during the course of his representation of defendant on the sex offense, he met personally with defendant at the jail on five occasions and talked with him on the telephone on six occasions. He also had contact with defendant's family. Rosenbaum did not count the number of contacts he had with defendant on the other pending

charges.

Rosenbaum stated that during the course of the three pending cases, numerous negotiations took place. He discussed these with defendant, and counteroffers were made. Rosenbaum discussed with defendant the possible risk he took if he went to trial. Defendant seemed to understand what he was being told. Rosenbaum discussed the plea offer with defendant, including the fact that the trial court could sentence him to between 4 and 15 years in DOC. Rosenbaum noted that the plea negotiations were not just for dismissal of the other charges. The sex charge was reduced from a Class X felony to a Class 1 felony and changed from the use of force with a weapon to the victim's inability to consent. Rosenbaum maintained these were all matters defendant told Rosenbaum he wanted in the plea agreement.

Rosenbaum testified that the only time he remembered mentioning four years in DOC was when defendant only had the stolen vehicle case. The offer at that time was for three or four years. Once the attempt (murder) and sex cases were filed, he never mentioned four years to defendant. Rosenbaum testified he was not able to contact any witnesses for defendant because defendant never gave him the full name or addresses of any witnesses. Rosenbaum did attempt to contact the victim's friend and the friend's mother because he felt the victim was very impeachable. Subpoenas were issued for them but were returned

indicating that they had moved with no forwarding address. Rosenbaum did not recall that defendant ever asked him to move for substitution of judge. The only indication in Rosenbaum's file regarding substitution was in an e-mail from defendant's sister after defendant was sentenced. She felt another judge should hear defendant's motion to withdraw the plea and motion to reconsider the sentence.

Rosenbaum testified that he was prepared to go to trial with a defense and impeachment of the victim. Defense counsel testified that he was ready for trial with a defense. He mentioned attacking the victim's version and that defendant told him defendant and the victim were at the same party and there had been "some consensual contact." However, ultimately defendant agreed to the negotiated plea. From Rosenbaum's perspective, defendant's trial waiver and plea were entered into voluntarily. Defendant seemed to understand. He never indicated to Rosenbaum that he was not pleading voluntarily or that he was under any stress or duress.

Rosenbaum testified that on the day of the plea, the procedure carried out by the trial judge was the normal procedure with all the normal questions. Defendant told the judge he entered into the plea voluntarily and that he was not under any stress or duress. The following colloquy then took place between defense counsel and Rosenbaum:

"Q. During the plea of guilty or just prior to the plea of guilty, I'm sure you went over with [defendant] the rights that he was giving up and the fact that there wouldn't be a trial. Did you have any sort of indication that he didn't understand what was going on?

A. Sometimes you would have to explain things to him once or twice. He slows [sic], educational background, his IQ, but once you explain it to him in very simple, basic terms, he always seems to understand it, yes.

Q. Did you--was there any issue of fitness, did that ever come up in your mind that a fitness exam should be completed?

A. No.

Q. You never had any sort of bona fide feeling that there might be a fitness issue?

A. Not a fitness, no.

                              ***

Q. During those conversations that you had with him, either in person or by telephone, did you have any occasion that he didn't understand what the nature of your

conversation was about?

A. No."

The court denied the motion to withdraw the guilty plea.

Regarding the motion to reconsider the sentence, the trial court found that the sentence imposed was appropriate. The motion to reconsider the sentence was denied.

In August 2006, defendant appealed on the grounds that counsel's certificate was not in strict compliance with Rule 604(d) (210 Ill. 2d R. 604(d)). The State conceded. This court remanded the case to the trial court for further proceedings. Tapscott, No. 4-06-0680.

In January 2008, defense counsel filed a certificate in compliance with Rule 604(d). At the January 2008 hearing on defendant's motion to withdraw guilty plea and motion to reconsider sentence, defense counsel indicated he stood on the previously filed motions. Regarding the motion to reconsider sentence, the trial court stated it had reviewed the transcript of the sentencing hearing. The court found the sentence appropriate and denied the motion to reconsider the sentence.

Regarding the motion to withdraw his guilty plea, defendant testified that he asked counsel to file a motion to withdraw because he was unsatisfied with the representation he received during the proceedings. Defendant asked the attorney to request a substitution of judge, but the attorney did not do so.

Defendant gave the attorney a list of witnesses he wanted him to contact and interview. Defendant talked to the people, and they said his attorney never contacted them.

On cross-examination, defendant testified that one of the people he wanted his attorney to contact was his godfather, Alonzo Bass, Jr. Bass was not present on the night of the sex offense. Defendant also wanted him to call two of his friends, Rico Bolden and Terry Moore, who were present on the night of the rape. Defendant stated they would testify that he did not rape the victim.

The State and defense counsel advised the trial court their agreement that, if Rosenbaum were to testify at the hearing, his testimony would be the same as in August 2006. The judge stated that he reviewed Rosenbaum's previous testimony. The court noted that Rosenbaum testified that defendant had not provided him with the names of any witnesses and that he was prepared to go to trial. The court also reviewed the transcript of the plea proceedings and observed that defendant received proper admonishments when he pleaded guilty. The court denied the motion to withdraw guilty plea. This appeal followed.

## II. ANALYSIS

Defendant raises two issues on appeal: (1) the trial court erred in not sua sponte ordering a fitness hearing after the PSI report indicated that defendant (a) was mildly mentally

impaired, (b) had been diagnosed with and treated for a number of mental-health disorders, and (c) had been prescribed numerous medications for the mental disorders, and (2) in the alternative, defense counsel was ineffective for not requesting a fitness hearing. The State argues that the court did not err and defense counsel was not ineffective. We agree with the State.

The Code of Criminal Procedure of 1963 states that there is a presumption of fitness to stand trial and be sentenced. 725 ILCS 5/104-10 (West 2004). The defendant bears the burden to show that a bona fide doubt exists as to his fitness to stand trial. People v. Hanson, 212 Ill. 2d 212, 221-22, 817 N.E.2d 472, 477 (2004). However, subjecting an unfit defendant to trial is a violation of the defendant's substantive due-process rights. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2; Hanson, 212 Ill. 2d at 216, 817 N.E.2d at 474. More specifically, a due-process violation would occur if the defendant is unable to understand the nature and purpose of the proceedings or assist defense counsel in his own defense. Hanson, 212 Ill. 2d at 218, 817 N.E.2d at 475. The competency standard to plead guilty or stand trial is the same, i.e., the defendant must understand the nature of the charge and purpose of the proceedings and be able to assist in his defense. People v. Heral, 62 Ill. 2d 329, 334, 342 N.E.2d 34, 36 (1976).

Although any party may raise the issue of a defendant's

fitness at any appropriate time, when a bona fide doubt exists as to the defendant's fitness, the trial court must sua sponte order a determination of the defendant's fitness before proceeding further. 725 ILCS 5/104-11(a) (West 2004). Whether a bona fide doubt exists is an issue that is within the trial court's discretion. People v. Straub, 292 Ill. App. 3d 193, 198, 685 N.E.2d 429, 432 (1997). The trial court is in a superior position to this court to view the defendant's behavior firsthand and make a determination based on its observance as to whether a bona fide doubt exists as to the defendant's fitness. People v. Murphy, 72 Ill. 2d 421, 431, 381 N.E.2d 677, 682 (1978).

"Fitness speaks only to a person's ability to function within the context of trial; it does not refer to sanity or competence in other areas. [Citation.] A person can be fit for trial although his mind may be otherwise unsound." People v. Coleman, 168 Ill. 2d 509, 524, 660 N.E.2d 919, 928 (1995). A defendant's diminished mental capacity does not, standing alone, make the defendant unfit to stand trial. People v. Johnson, 183 Ill. 2d 176, 194, 700 N.E.2d 996, 1005 (1998). Factors that are relevant for the trial court to consider in assessing the existence of a bona fide doubt of the defendant's fitness include (1) the rationality of the defendant's behavior and demeanor at trial and (2) any prior medical opinions on the issue of the defendant's fitness. People v. Eddmonds, 143 Ill. 2d 501, 518, 578

- 23 -

N.E.2d 952, 959 (1991); see Drope v. Missouri, 420 U.S. 162, 180, 43 L. Ed. 2d 103, 118, 95 S. Ct. 896, 908 (1975). Further, defense counsel's representations concerning his client's competency, while not conclusive, are another important factor to consider. Eddmonds, 143 Ill. 2d at 518, 578 N.E.2d at 959.

Defendant relies on this court's decision in People v. Shanklin, 351 Ill. App. 3d 303, 814 N.E.2d 139 (2004), as supportive of his argument. In Shanklin, the defendant pleaded guilty to attempt (murder) in the middle of a bench trial. Included in the PSI report was information that (1) the defendant had been hospitalized three times for mental-health problems and (2) tests conducted during the hospital stays indicated that the defendant was mildly mentally retarded. The defendant later filed a postconviction petition, alleging, in part, that he was unfit or incompetent when he entered his guilty plea. Shanklin, 351 Ill. App. 3d at 304-05, 814 N.E.2d at 141-42. The defendant supported his petition with copies of a psychological evaluation from a hospital that indicated, in pertinent part, the following: (1) the defendant had been admitted to Hartgove Hospital on three separate occasions when he was 15 or 16 years old, (2) he was seen for violent and disruptive behavior and assessed by psychiatric and social-work staff, and (3) the defendant had a low IQ in the mildly mentally retarded range and had difficulty receiving and retaining verbal information. Shanklin, 351 Ill. App. 3d

- 24 -

at 306-07, 814 N.E.2d at 143. The trial court later summarily dismissed the defendant's petition. Shanklin, 351 Ill. App. 3d at 305, 814 N.E.2d at 142.

The defendant appealed, and this court reversed the trial court's summary dismissal of his postconviction petition. We concluded that at sentencing (based on the information in the PSI report), the trial court should have been put on notice that "there was either a bona fide doubt of defendant's fitness to enter his guilty plea or at least a serious question as to his ability to comprehend what he was being asked." Shanklin, 351 Ill. App. 3d at 308, 814 N.E.2d at 144. We further concluded that the trial court should have conducted a fitness hearing. Shanklin, 351 Ill. App. 3d at 308, 814 N.E.2d at 144. In so concluding, we noted that the defendant's hospital information indicated that (1) the defendant's mental-health professionals made a clinical judgment that the defendant had significant problems in his verbal learning skills and an IQ in the mildly mentally retarded range and (2) the defendant "may not have been able to fully comprehend what was being verbally communicated to him either by counsel or the trial court as to the consequences of a guilty plea in this case." Shanklin, 351 Ill. App. 3d at 306, 814 N.E.2d at 143.

The case sub judice is factually similar to Shanklin but also distinguishable therefrom. Whether a bona fide doubt of

a defendant's fitness exists involves a fact-specific inquiry. See Eddmonds, 143 Ill. 2d at 518, 578 N.E.2d at 959, quoting Drope, 420 U.S. at 180, 43 L. Ed. 2d at 118, 95 S. Ct. at 908 ("there are 'no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated'").

Here, similar to Shanklin, when defendant was 16 years old, he was evaluated by the U of I. At that time, defendant was again diagnosed with a low IQ (63) in the "deficient range of intelligence," showing significant strengths in arithmetic and significant weaknesses in similarities, vocabulary, and block design. Defendant showed limited reading abilities; could not write in cursive; and had been diagnosed with behavior and conduct disorders, depression and anxiety, and ADHD. He was found to be emotionally much younger than his age with difficulty expressing himself. Defendant had a tendency to seek peer relationships with other youth who engaged in antisocial activities, and defendant would follow.

Several factors make the instant case distinguishable from Shanklin and support the conclusion that defendant understood the proceedings and assisted in his defense. Testimony at the sentencing hearing from defendant's former teacher indicated that he made significant improvements in his ability to follow

rules, understand what people asked of him, read, and converse. Rosenbaum testified that during his many interactions with defendant both in person and on the phone, he saw no evidence that defendant did not understand the proceedings. Rosenbaum acknowledged that defendant was slow and that sometimes he would have to explain things more than once but said he saw no indication that defendant did not understand. Rosenbaum saw nothing to indicate that defendant was not entering into the plea voluntarily or that defendant was under any stress or duress. Rosenbaum saw nothing to indicate a need for a fitness exam nor did he get any feeling that a bona fide issue of fitness existed.

Further, after being sentenced, defendant wrote to the trial court indicating he wanted to withdraw his guilty plea, and he also filed a pro se motion to withdraw his guilty plea alleging Rosenbaum provided him with ineffective assistance of counsel. At the hearing on the motion to withdraw, defendant's testimony demonstrated his grasp of the legal process. He testified that he wanted Rosenbaum to file for a substitution of judge because he felt Judge Difanis was prejudiced against him from previous encounters between the judge and defendant and his family. Defendant testified that Rosenbaum failed to investigate the case to his satisfaction because he failed to interview witnesses whose names defendant had given to Rosenbaum.

Defendant claimed he did not understand the rights he

was waiving, but when asked to be more specific, defendant said he did not remember most of them. Not remembering is different from not understanding. Defendant's stated reason for having told the court he understood his rights at the time they were given was that he "just had too much stuff on [his] mind." Again, this is quite different from not understanding. Defendant claimed he felt forced to plead guilty because he was "depressed" and that he thought he was going to get four years' imprisonment. However, defendant acknowledged that he knew the plea negotiations did not include any specific sentence and that he was going to be sentenced by the judge after a hearing. Defendant also admitted that he understood that as a part of the plea agreement, other serious charges (attempt (murder) and a higher-class sex crime) were being dismissed. He understood that he faced significantly less prison time because of the plea.

In this case, the record clearly illustrates that defendant understood the nature and purpose of the proceedings. The trial court provided defendant with a detailed explanation of the proceedings and informed defendant of his rights during those proceedings. Defendant stated that he understood. Further, the record shows that defendant participated in his own defense by communicating and conferring with his trial counsel. Defendant's counsel saw no evidence that a bona fide doubt existed of defendant's fitness to plead and be sentenced. Therefore, the trial

court did not abuse its discretion by not <u>sua</u> <u>sponte</u> ordering a fitness hearing.

Further, defendant has not established that his trial counsel was ineffective for not seeking a fitness hearing.  To establish a claim for ineffective assistance of counsel, defendant must meet the test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).  That is, he must establish both that his attorney's performance was deficient and that he was prejudiced as a result of the deficient performance.  <u>Strickland</u>, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.  The failure to establish either prong is fatal to a defendant's claim.  <u>People v. Caffey</u>, 205 Ill. 2d 52, 106, 792 N.E.2d 1163, 1197 (2001).  A court need not consider whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  If the ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer sufficient prejudice, the court need not decide whether counsel's errors were serious enough to constitute less than reasonably effective assistance.  <u>Strickland</u>, 466 U.S. at 697, 80 L. Ed.2d at 699, 104 S. Ct. at 2069.

To establish that his trial counsel's alleged incompetency prejudiced him, defendant "must demonstrate that facts existed at the time of his trial which raised a <u>bona</u> <u>fide</u> doubt

of his ability to understand the nature and purpose of the proceedings and to assist in his defense" (Eddmonds, 143 Ill. 2d at 512-13, 578 N.E.2d at 957). Therefore, defendant must demonstrate that the trial court would have found a bona fide doubt of his fitness and ordered a fitness hearing had defense counsel requested it under the circumstances presented. See Eddmonds, 143 Ill. 2d at 513, 578 N.E.2d at 957.

As discussed above, the record herein demonstrates that defendant both understood the nature of the proceedings and participated in his defense. Defense counsel testified that throughout his representation of defendant he saw nothing to indicate that defendant did not understand the proceedings or that there was a bona fide doubt of defendant's fitness. The trial court had several opportunities to observe defendant and interact with him in the courtroom. The court was aware of defendant's low IQ. For these reasons, under the circumstances of this case, it is unlikely that the court would have held a fitness hearing. Therefore, defendant did not receive ineffective assistance of counsel because he cannot prove the prejudice prong of the Strickland test.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal.

Affirmed.

KNECHT and TURNER, JJ., concur.