# Illinois Official Reports

## Appellate Court

---

### *People v. Hiatt*, 2018 IL App (3d) 160751

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. ROBERT HIATT, Defendant-Appellee. |
| District & No. | Third District<br>Docket No. 3-16-0751 |
| Filed | August 10, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Rock Island County, No. 13-CF-373; the Hon. Richard A. Zimmer, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | John L. McGehee, State's Attorney, of Rock Island (Patrick Delfino, Lawrence M. Bauer, and Jasmine D. Morton, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>Michael J. Pelletier, Peter A. Carusona, and Emily A. Koza, of State Appellate Defender's Office, of Ottawa, for appellee. |
| Panel | JUSTICE McDADE delivered the judgment of the court, with opinion.<br>Presiding Justice Carter and Justice Holdridge concurred in the judgment and opinion. |

**OPINION**

¶ 1        Defendant, Robert Hiatt, was charged with three counts of unlawful delivery of cannabis. He entered into a plea agreement with the State in which he pled guilty to the charges and was released on his own recognizance to assist the authorities until his sentencing hearing. A month later, the State requested a revocation of Hiatt's recognizance bond, which the trial court granted, and a warrant was issued for Hiatt's arrest. Subsequently, the court sentenced Hiatt *in absentia* to nine years' imprisonment. Fifteen days later, Hiatt was arrested in Florida and extradited to Illinois, where he was taken into custody. Hiatt filed a *pro se* postconviction petition, arguing, *inter alia*, that his trial counsel rendered ineffective assistance of counsel when he failed to investigate his mental state and that he was prejudiced because he was unfit to plead guilty. The petition advanced to the third stage of postconviction proceedings, and ultimately, the trial court vacated Hiatt's guilty plea. The State filed a motion to reconsider, which the trial court denied, and the State appealed. We affirm the trial court's grant of Hiatt's postconviction petition.

¶ 2                                                    FACTS
¶ 3        In April 2013, defendant was charged with three counts of unlawful delivery of cannabis for delivering cannabis to an agent of the Rock Island County Sheriff's Department. In November 2013, the State informed the court about the parties' negotiated plea:

>        "MR. LAREAU [PUBLIC DEFENDER]: Your Honor, we have a partially negotiated plea whereby Mr. Hiatt will be pleading open to all three counts of the information. We'll be releasing him on a recognizance pending the sentencing hearing to be held by agreement in front of Judge Braud."

When the court asked if the State agreed to the terms of the release despite defendant's criminal history, the State responded, "Yes, [Y]our Honor. There's some things the defendant needs to do to show that he should [*sic*] shouldn't go back to the department of corrections."

¶ 4        The court asked Hiatt if he understood the nature of his charges, the possible penalties, and his rights under the law, and he responded "yes." The court also asked Hiatt if he wished to plead guilty to the charges, and he responded "yes." Hiatt acknowledged that he signed a plea of guilty and waiver of trial by judge and by jury form that had stated he was entering a plea of guilty on all counts. The court accepted Hiatt's guilty plea and released him on his own recognizance. Hector Lareau, Hiatt's defense counsel, informed the court that the parties had agreed to delay the presentencing report and requested a review hearing. The court continued the case "for further review regarding the plea and subsequent sentencing to March 10th."

¶ 5        Prior to his release, Hiatt signed a form addressing the conditions of his recognizance bond. The form stated that (1) he must appear in court on March 10, (2) he must submit himself to the orders and process of the court, (3) he must not leave the state without authorization from the court, (4) he must not violate any criminal laws, (5) he must report to court services, and (6) he must notify the clerk of the circuit court of any change in his address.

¶ 6        In December 2013, the State made an oral motion to revoke Hiatt's recognizance bond, and the court granted the motion and issued a warrant for Hiatt's arrest. On March 10, 2014, Hiatt failed to appear in court. He failed to appear again on March 31, and the court sentenced him

*in absentia* to nine years' imprisonment and one year mandatory supervised release. In July 2014, he appeared in court and was taken into custody.

¶ 7    In May 2015, Hiatt filed a *pro se* petition for postconviction relief, arguing that Lareau rendered ineffective assistance when he failed to investigate and recognize his mental challenges. Hiatt also claimed that the parties had an agreement that he would plead guilty and receive probation if he would be "employed as a [D]rug Enforcement Agent, assigned to apprehend any Drug Lord or his conspirators/co-conspirators." He argued that he believed, pursuant to the agreement, "he'd become a police officer like he saw on television" and that he "followed a flow of drugs from Rock Island to Florida, where the police officers stopped him for being in a Drug infested part of the state." He alleged that his subsequent arrest and extradition to Illinois violated his constitutional rights because there were no charges against him in Florida. He also noted that he had been under psychiatric care and taking psychotropic drugs since he had been incarcerated.

¶ 8    The trial court advanced Hiatt's petition to the second stage of postconviction proceedings, and he was appointed counsel. Hiatt filed an amended postconviction petition, alleging that Lareau rendered ineffective assistance when he failed to investigate Hiatt's mental state before he pled guilty. Hiatt claims that his mental illness is evinced in his *pro se* petition when he stated that the plea agreement included his employment as a drug enforcement agent and that he believed he would become a police officer like he saw on television. He also argues that if Lareau had inquired into his mental state, Lareau would have discovered defendant was diagnosed with depression, anxiety disorder, psychosis, posttraumatic stress disorder (PTSD), obsessive-compulsive disorder (OCD), and attention deficit hyperactivity disorder (ADHD) and was taking medication. Moreover, Lareau would have discovered Hiatt's Iowa case, in which he was ordered to complete a fitness evaluation. Hiatt, however, was ultimately found fit to stand trial in the Iowa case. In the trial court's order of disposition, it stated that Hiatt must complete mental health treatment and provide proof to the court. The State filed a motion to dismiss the amended petition. The court denied the motion and advanced the petition to the third stage of postconviction proceedings.

¶ 9    In October 2016, an evidentiary hearing was held. Hiatt testified that, to his understanding, he and the State agreed that, "If I were to get out then I would—if I plead guilty then I can get out and I could go home, and then I had to put people—bust people, find people that were selling drugs and turn them in and then that would be it and I wouldn't have to go to prison." The judge was not "directly" notified of this agreement. When he was released, he returned to his neighborhood where individuals called him a snitch and would not associate with him. Based on this treatment, he assumed he could not set anyone up so he went to Florida to find drug dealers. He observed that there was not "much drug activity I felt going on up here" and believed that there will be "a lot more deals and stuff being made" in Florida. He did not know anyone when he went to Florida and "stayed on the streets." He was in Florida for four to five months until he was arrested on April 15, 2014, and extradited to Illinois.

¶ 10   Hiatt appeared in court in July and was shocked to learn that he had been sentenced to nine years' imprisonment. Hiatt stated that he did not agree to nine years. He was initially offered a plea deal of two years but "I thought it would be better if I could get out right away because it's hard for me to be in prison" so he agreed to be released on his own recognizance. He suffered from depression, anxiety, psychosis, PTSD, OCD, and ADHD. Since 2012, he had been taking psychotropic medication for his mental illnesses. When Hiatt was initially arrested, he was

consistently taking his medication in jail. When asked if Lareau asked him about taking psychotropic medication, he stated, "No, I don't believe he did. He could have, but I don't recall. He only came to see me I believe two times for 15 minutes and it wasn't—I can't remember exactly if he asked me, but if he would have asked me I would have told him the truth." He also stated that he did not recall talking to Lareau about his psychiatric treatment history.

¶ 11    In 2011, Hiatt was charged with second degree robbery in Iowa. During the pendency of the case, the court ordered him to perform a fitness evaluation. Lareau never asked Hiatt about the fitness evaluation. Hiatt never talked to Lareau about his mental health problems or his medication. When Hiatt entered into the plea agreement he had mental health problems but was taking medication. He believed his mental conditions and his medication affected his ability to enter into the agreement, and he would not have entered into the agreement under a different mental state. He stated that,

> "I feel when I have my relapses with mental illness I just feel like I don't know what's going on, I don't know where I'm at really and stuff like that. But right now I've been working on my—myself and trying to get better because I have a lot going on. When I get out I want to be better for my family."

¶ 12    After he began his nine-year sentence, Hiatt received different mental health treatment in the Illinois Department of Corrections (DOC) than he had in the Rock Island County jail. Defendant averred that if he had received the same treatment in the county jail,

> "I feel like my head would be more clear and to think about it than just to—just to answer and just say the wrong thing because when I'm—when I'm mentally going on it's like I don't understand what's going on and I don't know where I'm at. I'll live right down the street my whole life and I'll be standing there, like where am I, I don't know where I'm at. And then I'll go in the gas station and I'll ask the clerk to say, will you call my sister for me? And he'll be like, who is your sister? And that happens from time to time. And that's how I felt, and it's a very scary feeling and that's how I kind of felt around the time that I was going through."

¶ 13    Currently, Haitt was not taking the medication directed by the DOC because they made him feel suicidal. He had been dealing with his mental illnesses on his own. He was no longer taking Xanax or Adderall because "they told me that they—that was the medicine that I felt worked pretty good, but when I got to DOC they said we are not having this, you are not taking this. They started to put me on this other stuff, but I'm not taking it."

¶ 14    Hiatt remembered pleading guilty to all three counts because "that's what I had to do to go home so I did it" and "at the time I thought it was a good idea. So I thought it was just the best deal or go to prison." He realized that he had made a bad decision accepting the plea deal when he learned that he was sentenced to nine years' imprisonment. He knew he was supposed to return for sentencing on March 31 but did not know he would suffer consequences if he did not appear.

¶ 15    Lareau testified that he was an assistant public defender for Rock Island County Public Defender's Office. Hiatt was Lareau's client, and they met at least twice in the jail and other times in the courtroom. Initially, the State had offered Hiatt a four-year prison sentence. Lareau clarified that he would have explained to Hiatt that he could receive day-for-day credit and his sentence could be lessened to two years. The parties came to an alternative agreement in which

Hiatt would plead guilty and be released on recognizance bond if he did work for the authorities. Lareau explained that,

> "the objective was to keep Mr. Hiatt out of DOC. Mr. Hiatt has expressed to me several times that he was very, very reluctant to return. Apparently on his last trip to DOC he had gotten a pretty severe injury. He had a facial scar that was pretty prominent and he did not want to go back because he feared further injury or harm to his person."

Lareau "hope[d]" that if Hiatt cooperated with authorities, he would receive probation. Lareau and Hiatt never talked about Hiatt's medication. Lareau believed that Hiatt understood what was happening during his plea and that the plea agreement was the closest deal to meeting Hiatt's objectives of not returning to DOC. He never had trouble understanding Hiatt. Hiatt was told that he had to come back to court for sentencing. After Hiatt was released, Lareau did not have contact with him. He tried every number in Hiatt's file but was unable to reach him. He received a call from the state's attorney's office expressing concern that Hiatt had not been in touch with the authorities.

¶ 16    Hiatt never exhibited any behaviors that would make Lareau inquire into his mental condition. He would have inquired about Hiatt's mental condition if he had known that defendant was taking medication. Hiatt never told Lareau about his concerns of being unable to help the authorities because no one would associate with him or about his plan to go to Florida. When asked if Lareau knew about Hiatt's prior fitness evaluation in his Iowa case, Lareau responded,

> "You know, now that you say that it may be that I recall something about that, but nothing—I mean, I would have to looked [*sic*] at the file and notes and so on to have a particular recollection about that. But I guess you saying that makes me think that perhaps I did know about that."

The plea agreement did not involve Hiatt going down to Florida and getting "drug lords" but rather involved him working locally with authorities.

¶ 17    The trial court granted Hiatt's postconviction petition. Specifically, it stated:

> "A few comments. Mr. McCooley is quite right when he speaks of the *Mitchell* [(*People v. Mitchell*, 189 Ill. 2d 312 (2000))] case and merely being on drugs does not necessitate a fitness hearing. To put a finer point on it, my understanding of the issue or the law as it relates to the issue here after reading *Mitchell* is additionally merely having a mental illness would not necessarily require a fitness hearing. People can be on medication people, people can have mental illness, and it can be controlled and that doesn't rise to the level of requiring a fitness hearing.
>
> Additionally, I think for purposes of the *Strickland* [(*Strickland v. Washington*, 466 U.S. 668 (1984))] test as we are here today under these facts, the issue is not would a fitness hearing have been ordered or should have been ordered, but is there a reasonable probability that had one been ordered the defendant would have been found unfit. The reason being, there has to be some actual prejudice and if the evidence is to show that a fitness hearing would have been ordered and the defendant found fit that doesn't change anything so there's no prejudice.
>
> * * *
>
> I find [defendant's] testimony about the Florida trip credible. Looking at his testimony in its entirety and these other factors that seem to be right on point and

accurate, I don't have any reason to disbelieve him as he sits here about why he went to Florida, what he was trying to do, and I also believe him when he talks about maybe he's feeling better now.

Based on all that, I do agree with Mr. Nieman with respect to the second prong. I think there is a reasonable probability here that a fitness evaluation would have resulted in the finding of unfitness based upon what was going on in the defendant's mind at the time.

I do note the transcript. And as you go through that transcript it speaks basically what the defendant says, and this is typical of most transcripts. 'Yes, sir.' 'No.' 'Guilty.' 'Yes.' Things of that nature.

But in the *Mitchell* case there's some language in there: We recognize that a trial judge cannot rely on trial demeanor to dispense with a fitness hearing in the face of evidence of a *bona fide* doubt of defendant's fitness. So the transcript is not the end of the story here.

So, as I said, I do think the second prong has been met by the defense. First prong, there's alternative arguments and Mr. Nieman makes those arguments. I'll refer to them.

And, Mr. Nieman—correct me if I'm wrong—there's the post-plea argument and the pre-plea argument. I find the post-plea argument somewhat problematic because, assuming everything I just talked about is true, I don't find any evidence Mr. Lareau knew about that. I don't think he knew about the Florida thing. And to the extent he may have, it's not clear when. Mr. Lareau's memory is not that clear. I think he even said he didn't review his notes. And talks about a quick meeting at some point with Mr. Umlah here in the courtroom when, I believe, he referenced 15 other pretrials going on. And everybody that's in this courtroom on a regular basis knows how pretrials work here and the number of cases going.

\* \* \*

And with respect to the post-plea argument of Mr. Nieman I did look at the presentence investigation. There's one little line in there, but most of it is because he didn't report. There isn't any evidence for them to make any sort of determination in the presentence investigation of the type of issues we are talking about today.

At the same time I have no doubt in my mind that if the defendant had come back and had told Mr. Lareau he'd been in Florida trying to capture drug dealers in accordance with his agreement, I don't have any doubt in my mind Mr. Lareau would have requested a fitness hearing at that point. I think that would have been enough to trigger it. But, again, we are talking about things that didn't happen and there just isn't much that did happen post-plea to put Mr. Lareau on notice.

The one comment though that I keep coming back to in my notes and in my review of this is Mr. Lareau's testimony at one point. 'It could be that he recalls the Iowa fitness. Perhaps he knew it.' It seems like the tenor of his testimony was that, Mr. Nieman I believe asked that question, he does recognize in his memory that he has some awareness of a fitness issue in Iowa. So at this point he's aware of a fitness issue recently and no action is taken based on that not even to explore it with the defendant.

I'm granting a petition for post-conviction relief. The plea is vacated."

The State filed a motion to reconsider, which the trial court denied. The State appealed.

¶ 18                                              ANALYSIS

¶ 19        The State challenges the trial court's grant of Hiatt's postconviction petition, arguing that the court erred when it found that Hiatt's defense counsel rendered ineffective assistance of counsel. The Post-Conviction Hearing Act allows a defendant to challenge his conviction or sentence for violations of federal or state constitutional rights. 725 ILCS 5/122-1 *et seq.* (West 2016). To be entitled to postconviction relief, a defendant must show that he has suffered a substantial deprivation of his federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). Postconviction proceedings may include up to three stages. *Id.* at 472. "When a petition is advanced to a third-stage, evidentiary hearing, where fact-finding and credibility determinations are involved, we will not reverse a circuit court's decision unless it is manifestly erroneous." *Id.* at 473.

¶ 20        To prevail on a claim of ineffective assistance of counsel, the defendant must show that (1) counsel's performance was so seriously deficient as to fall below an objective standard of reasonableness under prevailing professional norms and (2) the deficient performance so prejudiced the defendant as to deny him a fair trial. *Mitchell*, 189 Ill. 2d at 332 (citing *Strickland*, 466 U.S. at 687). A counsel's performance is measured by "an objective standard of competence under prevailing professional norms." *People v. Easley*, 192 Ill. 2d 307, 317 (2000). "[T]he defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy." *Id.* Under the prejudice prong of the *Strickland* test, defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. *Id.*

¶ 21        The State claims that counsel's failure did not constitute deficient performance because Hiatt did not exhibit any behaviors during his guilty plea that would raise a *bona fide* doubt of his fitness. The State also argues that, even if defense counsel did not inquire about Hiatt's mental health, Hiatt was not prejudiced because (1) his prior Iowa case would not raise a *bona fide* doubt of his fitness because he was found fit to stand trial and (2) his history of taking medication for his mental illness alone does not raise a *bona fide* doubt of unfitness.

¶ 22        A defendant is presumed to be fit to stand trial. *People v. Griffin*, 178 Ill. 2d 65, 79 (1997). However, a defendant will be considered unfit if, because of his mental and physical condition, he is unable to understand the nature and purpose of the proceedings against him to assist in his defense. *Id.* "Fitness speaks only to a person's ability to function within the context of a trial; a defendant may be fit to stand trial even though the defendant's mind is otherwise unsound." *Id.* A defendant is entitled to a pretrial fitness hearing only when a *bona fide* doubt of his fitness to stand trial or be sentenced exists. *People v. Johnson*, 183 Ill. 2d 176, 193 (1998). "[T]he question of whether a *bona fide* doubt of fitness exists is a fact-specific inquiry." *People v. Rosado*, 2016 IL App (1st) 140826, ¶ 31.

¶ 23        The State relies on three cases to support its argument that Hiatt did not provide evidence that raised a *bona fide* doubt of his fitness at the time he pled guilty. In *Tapscott*, the defendant claimed that defense counsel rendered ineffective assistance of counsel when he failed to request a fitness hearing on direct appeal. *People v. Tapscott*, 386 Ill. App. 3d 1064, 1078 (2008). The Fourth District determined that the evidence revealed that the defendant understood the nature of the proceedings and participated in his defense when (1) defense

counsel testified that he did not observe anything that would give him a *bona fide* doubt of the defendant's fitness, (2) the defendant's testimony showed his understanding of the legal process, (3) the defendant's argument that he did not remember his rights did not prove he did not understand his rights, (4) the court knew about the defendant's low IQ, (5) the defendant stated he understood his rights and the details of the proceedings, and (6) the defendant communicated with his defense counsel. *Id.* at 1077-79. Therefore, the court ruled that the defendant did not meet the prejudice prong of the *Strickland* test. *Id.*

¶ 24 In *Rosado*, the defendant argued that the trial court erred when it dismissed his postconviction petition in which he claimed that trial counsel was ineffective for failing to request a fitness hearing. *Rosado*, 2016 IL App (1st) 140826, ¶ 41. The First District noted that the issue for the court was not whether the defendant suffered a mental illness but whether he was unable to understand the proceedings and cooperate with counsel. *Id.* ¶ 44. Based on this reasoning, it found that evidence of the defendant's mental illness history and the medication he was on at the time of his plea only showed the defendant suffered a mental illness and did not show his inability to participate in court. *Id.* Also, the court determined that the evidence showed that the defendant understood the nature and purpose of the proceedings. *Id.* ¶ 45. Specifically, he "behaved respectfully and rationally" in court, understood and wished to plead guilty to the charges and sentencing range, and was willing to relinquish his rights under the law. *Id.* ¶¶ 46-47. Furthermore, the defendant was evaluated prior to trial and found fit to stand trial. *Id.* ¶ 45. The First District concluded that there was no *bona fide* doubt to the defendant's fitness and that he was not prejudiced by defense counsel's failure to request a fitness hearing. *Id.* ¶ 49.

¶ 25 In *Tuduj*, the defendant alleged that defense counsel rendered ineffective assistance when counsel failed to request a reevaluation of his fitness to stand trial. *People v. Tuduj*, 2014 IL App (1st) 092536, ¶ 83. The First District reasoned that there was no *bona fide* doubt as to the defendant's fitness because (1) before the defendant's trial, the trial court conducted a fitness hearing and found him fit to stand trial, (2) neither the prosecution nor the defense questioned the defendant's fitness at the subsequent hearing, (3) "defendant's refusal to cooperate was based on a long-standing disagreement with his attorneys regarding trial strategy" and not based on mental illness, (4) the court did not express any concerns about the defendant's fitness to stand trial, and (5) the defendant was able to articulate his position and strategy at the hearing. *Id.* ¶¶ 91-96. The court also reasoned that defense counsel's statement that he might have a " 'mental illness problem,' " that he "might be bipolar," and that " 'there's probably a real fitness issue here, too' " did not raise a *bona fide* doubt of fitness because the statements only indicated the defendant's mental illness, not his inability to understand the nature of the proceedings against him. *Id.* ¶ 92. Furthermore, the court stated that defense counsel's statement that " 'there's probably a real fitness issue here' " contradicted his conclusion that the defendant would be found fit if another fitness hearing had been conducted. *Id.* ¶ 93. Thus, the court found that the defendant had not met the prejudice prong under *Strickland*. *Id.* ¶ 97.

¶ 26 These cases are all distinguishable from the present case. The courts in the aforementioned cases found that there was evidence to support the State's argument that the defendant understood the nature and purpose of the proceedings. Here, we find that Lareau rendered deficient performance. Lareau failed to inquire about defendant's prior fitness evaluation in his Iowa case although he acknowledged some awareness about that fitness evaluation. If he had inquired about the Iowa case, he would have learned that, although defendant had been found

fit, Hiatt's mental illness could affect his ability to plead guilty in a *subsequent* case because the trial court in the Iowa case ordered defendant to complete mental health treatment in its order of disposition. Moreover, there is no evidence that Lareau's failure to inquire about Hiatt's prior fitness evaluation was a matter of sound trial strategy.

¶ 27    We also hold Hiatt was prejudiced by counsel's performance because the evidence shows there was a *bona fide* doubt of his fitness at the time he pled guilty. Hiatt had been diagnosed with depression, anxiety disorder, psychosis, PTSD, OCD, and ADHD. When he was initially taken into custody, he consistently took the medications prescribed to him by the county jail. Hiatt testified that, during his guilty plea proceedings, his mental conditions and medications affected his ability to enter into the plea agreement because he was experiencing a "relapse with mental illness" and did not understand what was happening. This lack of understanding is evident in his petition in which he stated that he believed he would be "employed as a [D]rug Enforcement Agent, assigned to apprehend any Drug Lord or his conspirators/co-conspirators" and would become a police officer like he saw on television if he accepted the plea agreement. Subsequently, defendant went to Florida to "follow[ ] a flow of drugs from Rock Island to Florida" and set up individuals conducting drug activity. He did not know anyone in Florida and continued to "stay[ ] on the streets" until he was arrested. The trial court found defendant to be credible. Therefore, we find that trial counsel rendered ineffective assistance of counsel. Accordingly, we affirm the trial court's grant of Hiatt's postconviction petition.

¶ 28                                   CONCLUSION

¶ 29    The judgment of the circuit court of Rock Island County is affirmed.

¶ 30    Affirmed.