2022 IL App (1st) 200790

No. 1-20-0790

Opinion filed August 2, 2022.

Second Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 13 CR 12563 |
| | ) | |
| KIMBERLYNN BOLANOS, | ) | The Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Kimberlynn Bolanos pled guilty but mentally ill to the first degree murder of her five-month-old son, Isaac Bolanos. She then filed a petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)), which the trial court summarily dismissed. On appeal, defendant asserts that the trial court erroneously dismissed her petition because it stated the gist of a constitutional claim that she was unfit to plead guilty. We agree.

¶ 2                                    I. Background

¶ 3     On May 30, 2013, defendant, then 21 years old, killed her son by stabbing him 44 times. The State subsequently charged her with several counts of first degree murder and sought an extended-term sentence. She initially pled not guilty to the charges and raised an insanity defense. See 720 ILCS 5/6-2(a) (West 2012) (stating that "[a] person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct"). In addition, several doctors examined defendant over the course of this case. The only report appearing in our record, however, was made by defense expert Dr. Roni Seltzberg. Because this matter did not culminate in a trial, it is unclear whether the other doctors' reports were ever made part of the trial court record. Accordingly, the following information is derived from Dr. Seltzberg's report and the representations made by the attorneys below.

¶ 4     As a young teenager, defendant was a good student, ranking fifteenth in her freshman class. Unfortunately, serious problems began around the same time. Her parents divorced, her grades plummeted, and she obsessed over germs and locks. She also began cutting herself, ran away from home, attempted suicide, and was admitted to the hospital for psychiatric treatment. In addition, she developed bulimia, body dysmorphia, and a recreational drug habit. She may have been a victim of sexual assault as well. Furthermore, defendant believed that other people could hear her thoughts and that Puerto Ricans were tracking her on public transportation. She believed that God compelled her to write books that would be printed to help African countries. She screamed at airplanes. On one occasion, she jumped out of a car to scream at people at a bus stop because she thought she was being followed.

¶ 5     After graduating from high school, defendant held a few jobs and entered into a marriage of convenience with a man who lacked citizenship. She moved into her father's basement when

that relationship dissolved. Around this time, she received a driving under the influence charge and, according to her, engaged in prostitution. At age 20, she attempted suicide by injecting wasp poison into her heart. She believed that if she died, "everybody would stop getting tortured." Her death would "prove I'm not a spy for the wrong people." Defendant also believed that the government followed her and that she was capable of shutting down satellites. According to her mother, her family had a history of mental illness, including schizophrenia, depression, suicidal thoughts, and postpartum depression.

¶ 6    According to defendant, in July 2012, defendant went to the hospital after injecting heroin and learned she was four months pregnant by her boyfriend. While hospital records from that time indicated that defendant had already known she was pregnant, defendant apparently disputed the accuracy of those records. Additionally, defendant claimed she had believed that her lack of menstruation had something to do with lions in Africa. Upon learning of her pregnancy, she was happy, stopped using alcohol or controlled substances, and obtained prenatal care. Still, defendant thought she was killing bad people with her mind and that her baby would be the heir to her mission.

¶ 7    Isaac was born on December 12, 2012. No drugs were found in defendant's system. In addition, hospital personnel initially separated her from Isaac due to the heroin incident, causing her to fear that Isaac was being tortured, but they returned him to her. She was happy. Yet, a psychiatric consultation was requested due to certain comments defendant had made. This did not result in medication or treatment. Defendant stated that she did not tell hospital personnel that she was "a pawn" or that she was being followed because they would have thought she was "crazy."

¶ 8     Defendant and Isaac lived in her father's basement. According to family members, she was a good mother but did not let others take care of Isaac. She brought him into the shower rather than allow her father to watch him. Defendant's mother, who had watched Isaac only twice, was concerned that something was wrong but found nothing amiss when checking his body. Defendant stated that Isaac was her best friend and her joy, and she never thought she would be better off without him.

¶ 9     Meanwhile, defendant continued checking locks and engaged in excessive handwashing. She worked on a cure for cancer. She believed that family members were being tortured by "People at the Top," and she heard people walking around upstairs and screaming in the night. One day, a man whom defendant mistakenly believed to be a detective came to the house. She thought he was "looking for her because they thought she was a prostitute and used crack." She also feared that Isaac would be raped and tortured "to get stronger" and thought that "they" were coming to take him. As a result, defendant moved herself and Isaac into a motel. She continued to hear screaming at night and slept with a knife. According to defendant, "buff" people at the top knew she was thinking of killing herself and wanted to torture her for answers first. They intended to torture Isaac as well.

¶ 10    On May 29, 2013, defendant purchased knives and razors from the Dollar Tree. Jerry Brooks, Isaac's father, arrived at the hotel later that night to find defendant pacing with knives on each hip. She said she was not going to let anyone rape and torture her and told Brooks to try to kill her and Isaac if someone came. Upon Brooks's request, defendant gave him the knives, but they reappeared next to her in the morning. Brooks believed she had not slept, and according to defendant, she had smoked marijuana at some point.

¶ 11    Defendant reported that Brooks's phone began ringing at about 5 a.m., leading her to pray with a knife in her hand. She then brought Isaac into the bathroom with her, locking the door, and told Brooks to wait while she took a shower. She felt that she would never see Isaac again if she did not kill him before the torturers entered. Additionally, the deaths of defendant and Isaac would lead "them" to stop torturing her family and would "feed the world." Defendant told Isaac she would see him in heaven and stabbed him in the heart and lung so he would die quickly. She regretted it immediately because she wished "it didn't have to happen like that, that God would just take me." Because Isaac was coughing, she worried that "they" had already surgically moved "the part of his brain that was highly functional" down to another area "to connect it," so she stabbed him several more times. She then repeatedly cut herself in order to die and began passing out. While defendant thought that perhaps she should have killed Brooks too, as he was possibly being tortured already, she had decided to "leave him there so people will know, enough jobs for everybody, recycling."

¶ 12    Meanwhile, Brooks noted that defendant and Isaac had been in the bathroom for some time and knocked on the door. Defendant said everything was fine, but Brooks saw blood on the floor through the space under the door. When Brooks threatened to break the door down, defendant opened it. Brooks saw that defendant was standing over Isaac, who was in his car seat with severe injuries to his head. He was covered in blood and appeared to be dead. Brooks ran to the motel office and had an employee call 911. He then flagged down a squad car. Ultimately, firefighters broke down the bathroom door with an axe.

¶ 13    Defendant was found holding five-month-old Isaac in the bathtub with hot water coming from the shower. As stated, he had 44 stab wounds, including two overlapping neck wounds that went from ear to ear. At the hospital, he was declared dead on arrival.

¶ 14    Defendant sustained 25 self-inflicted stab and incise wounds to her arms and chest. She had also lost approximately three liters of blood but was alert. Before undergoing surgery, defendant refused a blood transfusion until her mother convinced her to accept one. Defendant also told her mother that Isaac was not actually dead and that defendant would "be able to feel if he was." In addition, Dr. Rajeev Panguluri, Dr. Morales, a nurse, and a social worker all found her to be psychotic. She was subsequently admitted for psychiatric treatment at Cermak Hospital, where the intake employee found her to be "disorganized and delusional." She remained under their care through October 2013.

¶ 15    During her time there, defendant would indicate that her appetite was good but then refuse food and liquids. She feared that Isaac might still be alive and subject to torture but denied that she was delusional or disorganized. On one occasion, she said she wanted her son back. On another occasion, she said that she killed Isaac and attempted to kill herself to protect them from a group responsible for global warming. Furthermore, she told her anger management group that "[i]t's hard to forgive when I know I didn't do anything wrong." Defendant also told Dr. Seltzberg, "God is gonna bless me. He knew I was trying to help a lot of people in the world. It backfired in my face. My son is deceased."

¶ 16    After this offense, defendant had told the police that she purchased knives to protect Isaac because "they" were going to take him away. She feared he might be raped and tortured and thought it better for him to die quickly by being stabbed in the heart and then go to heaven. She also reported that after stabbing Isaac, she was not convinced that he was deceased because his body was not hard. Defendant later stated that she had agreed to be videotaped by police "to prove to the People at the Top [that] I was just trying to help." She added that if she had died, her family and friends would not be tortured anymore. According to defendant, "I wasn't just a pawn

but a girl trying to help the world." Although she had been trying to prove something when speaking to the police, she was no longer trying to prove anything and now would say nothing to the police without her lawyer. While she did not recall being Mirandized, "it probably would not have made a difference because of the way I was thinking." She thought that, after the police interrogation, she would be let go and her family would stop being tortured. Alternatively, "they'd throw me in jail for years to make an example out of me for my family, let them go and keep me in prison."

¶ 17    Dr. Jonathan Howard diagnosed defendant with textbook postpartum psychosis, noting her delusion that persons wanted to harm her and Isaac. Dr. Doodarodman diagnosed her with schizophrenia in addition to anxiety and depression. In addition, Dr. Gunaratnam found her symptoms to be consistent with schizophrenia and found she had lived "a long time with symptoms she didn't know weren't normal." Cermak Hospital doctors prescribed different medications with mixed results, including drowsiness, hunger, and "bizarre delusions and auditory hallucinations."

¶ 18    On December 30, 2013, Dr. Seltzberg diagnosed defendant with: "Schizoaffective Disorder, bipolar type, multiple episodes, currently in partial remission." Additionally, she had a history of obsessive-compulsive disorder. Dr. Seltzberg also found that her behavior during the offense was fueled by delusions and hallucinations of persecution and torture, and she acted to save her son, her family, and herself. She believed her sister lied when denying being tortured. Consistent delusions continued for months after Isaac's death, and she had grandiose and paranoid thoughts with minimal insight.

¶ 19    Dr. Seltzberg opined that defendant was legally insane at the time of Isaac's death and suffered from "an acute exacerbation of her previously undiagnosed psychotic mental disease,

likely further exacerbated by postpartum psychosis." Dr. Seltzberg also found that defendant was incapable of understanding the *Miranda* warnings she was given by the police. See *Miranda v. Arizona*, 384 U.S. 436 (1966). She was fit to stand trial with medication, however. Dr. Seltzberg gave several examples of her ability to understand the charges and proceedings and found she was able to assist defense counsel.

¶ 20    Meanwhile, other experts continued to examine defendant. In May 2014, Dr. Susan Messina opined that defendant had the ability to comprehend *Miranda* warnings at the time of her arrest. In August 2014, Dr. Messina found that defendant was sane at the time of the offense. Dr. Nishad Nadkarni reached the same conclusions that month.

¶ 21    At a hearing on June 11, 2015, defense counsel stated that she would be presenting the testimony of five doctors and one social worker at trial. During a discussion about the anticipated length of trial, the court stated, "Ms. Bolanos, stay with me, will you, please."

¶ 22    In early 2016, defendant was evaluated by Dr. Stafford Henry, Dr. Hendricks, and Dr. Hartman. Dr. Henry requested additional testing for possible malingering. The record does not disclose the ultimate determinations of these doctors, however. Defense counsel reviewed the foregoing experts' reports with Dr. Seltzberg and retained Dr. Robert Hanlon to conduct additional testing. Once again, our record is silent with respect to what if anything came of that. Suffice it to say, it appears that the experts had different opinions.

¶ 23    On October 25, 2016, defense counsel informed the court that defendant wished to have a guilty plea conference (Ill. S. Ct. R. 402 (eff. July 1, 2012)). The court stated, "This may take a while. Keep the defendant up." The court then explained the nature of a guilty plea conference, and defendant indicated that she understood. During the conference, the State's proffer regarding the offense itself included much of the above information. The State added that when defendant

was taken to the hospital, she told an ambulance emergency medical technician (EMT) that she killed Isaac because "she was worried DCFS would take him away. Because they believed she was using crack." When the EMT asked if she was actually using crack, she answered, "allegedly." The State also added that defendant did not actually plan to kill herself during her first four suicide attempts. According to the State, four doctors diagnosed defendant with a personality disorder that causes her to behave in an antisocial manner. Furthermore, "[t]hey all indicated she is not delusional. No history of delusions, no history of hallucinations." She told Dr. Henry that as soon as she started stabbing Isaac, she regretted it, showing that she knew what she was doing. When questioned by mental health practitioners prior to Isaac's murder, defendant denied experiencing delusions or hallucinations.

¶ 24    Defense counsel played the recording of the police interview of defendant. Like the majority of the experts' opinions, that recording is not contained in the record on appeal, and it is unclear whether it was made part of the trial court record. In addition, defense counsel pointed out that Dr. Henry examined defendant three years after this offense and did not interview defendant's parents. Defense counsel argued that defendant loved Isaac and that "[w]omen do this sort of thing." Counsel further argued that the minimum 20-year sentence would be significant, "[e]specially for someone with a mental illness, with a disease, that most likely caused this incident to occur. There really is no other rational explanation for it."

¶ 25    The trial court found this case to be very tragic and very chilling. Although the court would allow defendant to plead guilty but mentally ill, it found she did not deserve a sentence close to the minimum. The court stated, "I'll offer 38." After discussing the offer with counsel, defendant expressed her desire to accept it. The court continued the case to be sure defendant was certain.

¶ 26     The next day, defendant pled guilty but mentally ill to first degree murder in exchange for 38 years in prison. She was admonished and appropriately answered the court's questions before pleading guilty. She stated that no force, threat, or promise had led to her plea, and she was pleading guilty of her own free will. Subsequently, the State offered a somewhat abbreviated version of the facts discussed the day before, and defense counsel stipulated that "that's what the State's evidence would show." After accepting the plea, the court proceeded to sentencing.

¶ 27     The trial court commented that it had reviewed Dr. Seltzberg's "very detailed report," which the parties stipulated would be consistent with her testimony. Although Dr. Seltzberg found defendant was insane at the time of the offense, the parties stipulated that defendant was not proceeding on the insanity defense. The court agreed that "this does not give rise to an affirmative defense of insanity." Furthermore, the plea of guilty but mentally ill would not impact the volitional nature of the offense. That being said, the court found there were significant mitigating factors, particularly her psychiatric history and state of mind during the offense. The court reiterated that this case was chilling and the expressed its hope that Isaac's pain ended quickly. The court then sentenced defendant to 38 years in prison and admonished her regarding her right to appeal. She did not file any postjudgment motion or a notice of appeal.

¶ 28     On October 22, 2019, defendant filed a *pro se* postconviction petition asserting that she was still suffering from mental illness when she pled guilty and was incapable of making an informed decision or properly defending herself. After she was incarcerated at Logan Correctional Center, she gouged out both of her eyes. The Illinois Department of Corrections website confirms the veracity of this allegation. See *People v. Lindsey*, 2016 IL App (1st) 141067, ¶ 28 (recognizing that reviewing courts may take judicial notice of the Illinois Department of Corrections website). Additionally, since pleading guilty, she had twice been

transported to the mental hospital and presently lived in the prison's mental health unit. Defendant also alleged that her postpartum psychosis and depression diagnoses were not sufficiently brought out in the trial court.

¶ 29　On January 17, 2020, the trial court entered a 12-page written order summarily dismissing defendant's petition as frivolous and patently without merit. The court did not specifically address defendant's assertion that she was unfit to plead guilty. We subsequently allowed defendant leave to file a late notice of appeal, as she had been on mental health watch in a stripped cell. See Ill. S. Ct. R. 606(c) (eff. July 1, 2017).

¶ 30　　　　　　　　　　　　　　　　　II. Analysis

¶ 31　On appeal, defendant challenges the summary dismissal of her petition on the basis that the petition alleged the gist of a due process violation in that she was unfit to plead guilty.

¶ 32　The Act provides a vehicle for defendants to assert that their convictions resulted from a substantial denial of their constitutional rights. *People v. House*, 2021 IL 125124, ¶ 15. In addition, the Act's purpose is to permit inquiry into constitutional issues that could not have been determined on direct appeal. *Id.* The trial court may dismiss a petition that is frivolous or patently without merit, however. *People v. Hatter*, 2021 IL 125981, ¶ 23. This occurs where the petition lacks an arguable basis in law or fact. *People v. Johnson*, 2021 IL 125738, ¶ 26. Specifically, a petition lacks an arguable basis where it relies on an indisputably meritless legal theory or a fanciful allegation. *Hatter*, 2021 IL 125981, ¶ 23. Yet, the threshold to survive summary dismissal is low. *Id.* At the first stage of postconviction proceedings, a defendant need provide only a limited amount of detail (*People v. Brown*, 236 Ill. 2d 175, 188 (2010)) and the defendant's allegations must be liberally construed and accepted as true unless contradicted by

the record (*Johnson*, 2021 IL 125738, ¶ 25). We review the summary dismissal of defendant's petition *de novo*. *Id.* ¶ 28.

¶ 33    Due process prohibits the prosecution of a defendant who is unfit. *People v. Stahl*, 2014 IL 115804, ¶ 24. Additionally, a defendant is unfit where, due to a mental condition, she is unable to understand the nature and purpose of the proceedings or is unable to assist in her defense. *Brown*, 236 Ill. 2d at 186. A defendant must be able to consult with defense counsel with a reasonable degree of rational understanding and with an understanding of the proceedings that is both factual and rational. *Stahl*, 2014 IL 115804, ¶ 24; see also *People v. Williams*, 188 Ill. 2d 365, 370 (1999) (recognizing that due process requires a guilty plea to be entered knowingly and voluntarily). This is true regardless of whether the defendant stands trial or pleads guilty. *People v. Shanklin*, 351 Ill. App. 3d 303, 306 (2004). Fitness speaks only to a defendant's ability to function within a prosecution, however. *People v. Griffin*, 178 Ill. 2d 65, 79 (1997). A defendant may be fit for court proceedings even where her mind is otherwise unsound. *Id.*

¶ 34    Defendants are presumed fit to stand trial and bear the burden of demonstrating a *bona fide* doubt of their fitness, *i.e.*, a real, substantial, and legitimate doubt. *People v. Hanson*, 212 Ill. 2d 212, 221-22, 226 (2004). Determining whether a *bona fide* doubt exists involves a fact-specific inquiry. *People v. Hiatt*, 2018 IL App (3d) 160751, ¶ 22. Relevant factors include a defendant's irrational behavior, her courtroom demeanor, any medical opinion on her competence, and any representations made by defense counsel. *Brown*, 236 Ill. 2d at 186-87. No fixed or immutable signs exist, however, that invariably indicate that further inquiry into a defendant's fitness is necessary. *Hanson*, 212 Ill. 2d at 222. Instead, the question is difficult and implicates a wide range of subtle nuances and manifestations. *Id.* Neither mental illness nor a suicide attempt or the use of psychotropic medication, standing alone, create a *bona fide* doubt of

a defendant's fitness. *Brown*, 236 Ill. 2d at 187. Still, individual suggestions of unfitness cannot be viewed in isolation. *Id.* Instead, they must be considered as a whole. *Id.* at 188; see also *Griffin*, 178 Ill. 2d at 79 (finding that once a *bona fide* doubt of the defendant's fitness has been established, the burden then falls to the State to show the defendant is fit by a preponderance of the evidence).

¶ 35   We find defendant's contention that she was unfit to plead guilty does not lack an arguable basis in law or fact.

¶ 36   First, the record arguably supports defendant's assertion that her mental illness impacted her participation in the proceedings against her. In June 2015, the attorneys and the court were discussing the projected length of trial and defendant's insanity defense. The court stated, "Ms. Bolanos, stay with me, will you, please." While the record does not shed light on the specific reason for the court's comment, it indicates that defendant was not following the proceedings, regardless of whether the cause was drowsiness or some other distraction.

¶ 37   On October 25, 2016, just before the guilty plea conference began, the court stated, "[t]his may take a while. Keep the defendant up." Similar to the June 2015 comment, the record does not indicate whether the court's statement on this occasion was based on defendant's demeanor that day or her demeanor on prior occasions. Yet, *something* led the court to make this unusual remark.

¶ 38   The State nonetheless argues that the record positively rebuts defendant's assertion that she was not fit. We agree that on the day in question, defendant appeared to have no difficulty answering the court's questions, but we also observe that she did not speak at any length. In addition, the record indicates that on occasion, she has withheld information from others to avoid appearing "crazy." See also *Shanklin*, 351 Ill. App. 3d at 307 (recognizing that a judge may be

confronted by a defendant attempting to conceal his mental disability). We cannot say that defendant's performance in the courtroom that day renders it impossible that she was unable to understand the nature and purpose of the proceedings, both factually and rationally, or was unable to assist in her defense. See *Brown*, 236 Ill. 2d at 183, 190-91 (finding the defendant's brief exchanges with the court did not positively rebut his petition's allegations or conclusively demonstrate an ability to understand the proceedings and assist in his defense).

¶ 39    Finally, we observe that Dr. Seltzberg was apparently the only doctor to consider defendant's fitness to stand trial or plead guilty. While the State's brief says otherwise, it has failed to cite to any page of the record showing that other doctors specifically opined on her fitness to do so. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). In addition, Dr. Seltzberg determined that defendant was fit with medication. We cannot ignore, however, that Dr. Seltzberg made this determination approximately three years before the plea conference and guilty plea in this case. We find it at least conceivable that Dr. Seltzberg, with additional information, may have reached a different conclusion.

¶ 40    At the time the report was authored, Dr. Seltzberg would not have been aware of the behavior leading the trial court to comment on defendant's demeanor or lack of alertness. Dr. Seltzberg would also not have been aware that defendant's mental condition was such that she ultimately gouged out her eyes. Assuming defendant was on the same medication both during court proceedings and at the time of her self-mutilation, this would potentially call into question Dr. Seltzberg's determination that medication could sufficiently render defendant fit. A mental illness so severe as to lead one to carry out such an act would at the very least have the power to distract a defendant in the courtroom. See also *People v. Moore*, 408 Ill. App. 3d 706, 710, 712-13 (2011) (finding that where the defendant needed medication to be fit for trial, the absence of

medication raised a *bona fide* doubt as to the defendant's fitness, required remand for a retrospective fitness hearing).

¶ 41    To be sure, additional details are required to make any definitive determination, such as when the unfortunate event occurred and what medications she was taking at that time, but at this early stage of proceedings, very limited details are required. We find defendant has sufficiently shown that the trial court would have found that a *bona fide* doubt of her fitness to plead guilty existed had the court known that, even on medication, her mental state was still sufficiently severe to lead her to gouge out her eyes.

¶ 42                                    III. Conclusion

¶ 43    We agree that this case is chilling. In addition, the determination of whether a *bona fide* doubt of fitness exists can be a difficult one. Given defendant's history, questionable courtroom demeanor, and post-plea tragedy, however, we find defendant's case warrants further inspection at second stage postconviction proceedings.

¶ 44    For the foregoing reasons, we reverse and remand for further proceedings.

¶ 45    Reversed and remanded.

2022 IL App (1st) 200790

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-CR-12563; the Hon. Charles P. Burns, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Bryon M. Reina, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Daniel Piwowarcyk, and Amari Dawson, Assistant State's Attorneys, of counsel), for the People. |