**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220184-U

Order filed June 9, 2023_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-22-0184 Circuit No. 17-CF-1510 |
| CHAVEZ R. ODIO, | ) ) ) | Honorable Daniel Patrick Guerin, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justice Peterson concurred in the judgment.
Justice McDade specially concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The trial court did not abuse its discretion when it denied defendant's motion to withdraw her guilty plea. Defendant failed to show counsel provided ineffective assistance by failing to argue that the trial court gave inadequate admonishments. Affirmed.

¶ 2     The State charged defendant, Chavez R. Odio (then age 28), with numerous offenses arising from a July 25, 2017, incident in which she allegedly burglarized a home, attacked an occupant in the home, and set fire to the home. Defendant pled guilty to aggravated arson and

attempt first degree murder. The trial court sentenced defendant to 28 years' imprisonment and ordered her to pay restitution. Defendant thereafter filed a motion to withdraw her guilty plea. The trial court denied the motion, and defendant appealed. For the reasons that follow, we affirm.

¶ 3                                              I. BACKGROUND

¶ 4        In August 2017, the State indicted defendant in connection with a July 25, 2017, incident in which the State alleged defendant entered the home of Maria Espinosa in Du Page County, while armed with a knife, knowing (or with reason to know) that the home was occupied, and intending to commit a theft and another felony; stabbed and attempted to suffocate Dominique Wittmeyer with intent to commit first degree murder; and knowingly partially damaged the building by means of fire or explosive, knowing the building was occupied and causing a fireman to be injured. The State also alleged defendant was knowingly in possession of a stolen motor vehicle on that day, a 2000 Acura. Accordingly, the State charged defendant with two counts of home invasion (720 ILCS 5/19-6(a)(1) (use of force against person within), (2) (intentionally caused injury) (West 2016)); two counts of residential burglary (*id.* § 19-3(a) (intent to commit theft and intent to commit felony)); two counts of aggravated battery (*id.* § 12-3.05(a)(1) (causes great bodily harm), (f)(1) (use of a deadly weapon)); two counts of aggravated arson (*id.* § 20-1.1(a)(1) (knowing one or more persons present), (3) (fireman injured)); one count of attempt murder (*id.* § 5/8-4(a) (West 2016)); and one count of unlawful possession of a motor vehicle (625 ILCS 5/4-103(a)(1) (West 2016)).

¶ 5        On January 17, 2019, defendant entered an agreement to plead guilty to two of the counts charged: aggravated arson with injury to a fireman and attempt first degree murder with respect to Dominique Wittmeyer. Under the agreement, the State recommended consecutive sentences of 14 years for each count to be served in the Illinois Department of Corrections (IDOC) at 85%, and

2

defendant agreed to pay an unsatisfied judgment of restitution, the amount to be determined at a later date.

¶ 6    At the outset, the State specifically indicated that it sought restitution as part of the plea agreement:

"[ASSISTANT STATE'S ATTORNEY]: Judge, I believe we have an agreement to be implemented partially today and partially on a future court date whereby the defendant today would enter pleas of guilty to two counts and at a future date there would be an agreed recommendation as to sentence.

And I am prepared today to put the—almost all the terms of that agreement of the record. *The agreement would also include an unsatisfied judgment as to restitution*. We don't have those numbers yet, so we would need to get those, and we would also need to, under the Victim's Bills of Rights, to touch base with the victim about [her] right to do a victim impact statement; I guess both her and the firefighter, if they wanted to. We don't anticipate that would change the terms of the offer." (Emphasis added.)

The State also engaged in the following exchange with the court:

"[ASSISTANT STATE'S ATTORNEY:] With respect to the restitution amounts, we will seek and provide to counsel any documentation that the victims are coming forthwith with respect to the damage to the property as a result of the arson and medical expenses for the injuries sustained by the victims as a result of the stabbing, or being injured and escaping from the fire, and then the firefighter's injuries. We don't have that figure now, though.

THE COURT: I understand, but it's contemplating that whatever that figure is, it's going to be an unsatisfied judgment to be entered?

3

[ASSISTANT STATE'S ATTORNEY]: That is what's contemplated. We don't expect the defendant would have funds to pay that."

The trial court admonished defendant of her rights during a colloquy as follows:

"THE COURT: All right. Ms. Odio, there are two charges remaining here. Count 2 alleges the offense of aggravated arson brought as a Class X felony, and Count 4 alleges attempt first degree murder, also brought as a Class X felony.

Class X felonies have a range of possible penalties of 6 to 30 years in the Illinois Department of Corrections. A sentence to the Department of Corrections would be followed by three years of mandatory supervised release, or parole. They carry possible fines of up to $25,000. Those are the maximum penalties.

Class X felonies are offenses for which probation is not available. That means if you're pleading guilty to these offenses today, you have to be sentenced to the penitentiary for some range between 6 to 30 years.

I've been also advised that if you're entering pleas of guilty to both of these counts that any sentence imposed has to be served consecutive to each other, not concurrently with each other, and that any sentence has to be served not at day-for-day credit, but at 85 percent of the sentence imposed.

Do you understand these charges and the range of possible penalties?

THE DEFENDANT: Yes.

THE COURT: Did you hear the state's attorney go through the terms of this agreement?

THE DEFENDANT: Yes.

THE COURT: Is that your understanding of what it is you are agreeing to?

4

THE DEFENDANT: Yes, two counts for 14 years consecutive, total of 28 years.

THE COURT: Total of 28 years. You understand that?

THE DEFENDANT: Yes.

THE COURT: Okay. Pursuant to this agreement, is it true today you wish to enter pleas of guilty to these two counts?

THE DEFENDANT: Yes.

THE COURT: Do you understand you have the right to continue with your plea of not guilty and to have asked that your case proceed to a trial?

THE DEFENDANT: I understand I'm waiving those rights.

THE COURT: You're entitled to have had either a trial in front of a jury where we would have selected 12 jurors to hear the evidence. They would have decided whether you're guilty or not guilty, or you could have waived your right to a jury and asked for a judge to hear the case. The judge would have decided whether you're guilty or not guilty.

Do you understand that?

THE DEFENDANT: I understand.

THE COURT: And as you've indicated, you understand that by pleading guilty today, you're giving up your right to such a trial?

THE DEFENDANT: Correct.

THE COURT: You're also giving up your right to have required the State to bring in witnesses to try to prove these charges, witnesses that you and your attorney could confront, cross-examine; you're giving up your right to have subpoenaed witnesses on your own behalf; you're giving up your right, if you had wished, to present evidence or defenses in your own behalf; you're giving up your right to either testify or remain silent; and you're

giving up your right to have required the State to have been able to prove you guilty by proof beyond a reasonable doubt. Do you understand that?

THE DEFENDANT: I understand.

THE COURT: Knowing these rights, do you wish to continue with this plea of guilty?

THE DEFENDANT: Yes.

THE COURT: Are you entering this plea of guilty and the agreement freely and voluntarily?

THE DEFENDANT: Yes.

THE COURT: Has anyone in any way forced you or coerced you into doing this?

THE DEFENDANT: No.

THE COURT: Other than this proposed agreement, has anyone made any other promise or representation to you in order to get you to plead guilty?

THE DEFENDANT: No.

THE COURT: Are you presently taking any type of medication, drug, any other factor that might affect your ability to understand what's taking place here today?

THE DEFENDANT: No.

THE COURT: And you understand what has happened, you just entered a plea of guilty pursuant to the agreement, and on a future date we're going to actually impose the sentence that's been agreed to here today.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Are you a citizen of the United States?

THE DEFENDANT: Yes.

THE COURT: Have you been satisfied with the representation of your attorneys in this case?

THE DEFENDANT: Yeah."

After this colloquy, the State presented the factual basis for the guilty plea. The State noted that, in exchange for defendant's guilty plea, the State would also decline to file witness harassment or solicitation of murder charges pertaining to communications from defendant while in the Du Page County jail. The factual basis can be summarized as follows.

¶ 7 In the early morning hours of July 25, 2017, defendant was dropped off at 671 Circle Avenue in Roselle, Illinois, in possession of a knife. Defendant entered the town home, which at that time was occupied by Dominique Wittmeyer and Christopher Seong. Defendant, who wore dark clothing, stabbed Wittmeyer several times and placed a plastic bag over her head, attempting to suffocate her, though Wittmeyer was able to escape and run upstairs. A black hoodie with the victim's blood was later found in defendant's home. Neither of the occupants had used the stove or lit anything incendiary in nature. Nonetheless, the home became engulfed in flames, which arson investigators later determined was caused by an open flame ignition of available ordinary combustibles; a knob on the first floor oven was on the on position. When Seong smelled smoke and natural gas and looked outside of his doorway, the first floor was fully engulfed in flames. Both Wittmeyer and Seong jumped from the second floor to escape the fire, which caused damage exceeding $150. Further, a motor vehicle had been taken from the driveway at the residence, which was later located approximately one block from where defendant resided.

¶ 8 The court found a factual basis for the guilty plea and accepted the plea. It then inquired as to when the sentence would be imposed. In response, defense counsel stated, "*I think primarily we*

*were waiting on the restitution figures* and any victim impact statements, so however long it would take the State." (Emphasis added.) The court thereafter continued the case for sentencing so the State could determine the amount of restitution and whether either victim wished to make an impact statement.

¶ 9   On February 14, 2019, counsel for defendant informed the trial court that defendant wished to withdraw her plea. The court stated it would impose the sentence first as a procedural matter. The court sentenced defendant to 14 years' imprisonment on each count, to be served consecutively for a total of 28 years (served at 85%), with 3 years' mandatory supervised release, plus restitution in the amount of $63,531 and all statutory fines and costs. The court also admonished defendant of her right to appeal and her right to file a written motion to withdraw her plea.

¶ 10   The next day, defendant filed a motion to withdraw her guilty plea, which she later amended. The amended motion included a Rule 604(d) certificate. The court denied the motion following a hearing. On January 19, 2021, however, the appellate court vacated the denial of defendant's motion to withdraw her guilty plea and remanded the case to give defendant the opportunity to (1) file a valid Rule 604(d) certificate, (2) file a new motion to withdraw the guilty plea, and (3) participate in a new motion hearing.

¶ 11   In January 2022, defendant filed an amended motion to withdraw her guilty plea with an affidavit, arguing she did not knowingly, intelligently, or voluntarily waive her right to trial. The affidavit, dated December 21, 2021, provided as follows. Since childhood, defendant had suffered from anxiety and panic attacks brought on by stress, and she experienced increased anxiety after being charged in the instant proceeding. In June 2017, she had an abortion. Following her arrest

8

on July 27, 2017, defendant remained in custody at the Du Page County Jail; she did not know she had been diagnosed with mental illness and did not receive any psychiatric medications.

¶ 12    Due to her anxiety from being incarcerated, she had difficulty sleeping. Defendant stated that, at the time of her plea, "I heard voices directing me to plead guilty"; "I was experiencing a panic attack. I felt a weight on my chest, had difficulty breathing and an inability to think clearly"; "I felt coerced to accept the State's offer due to being told that the State would file additional criminal charges against me if I did not accept the offer"; and "I did not fully comprehend the court's admonitions." Since being transferred to the IDOC, defendant had been prescribed Paxil, Geodon, and Hydroxyzine; these medications helped her symptoms but did not eliminate them. In her motion, moreover, defendant argued that "the abortion experience can lead to the development of or a higher risk for psychiatric disorders" and that, at the time of her plea, she suffered from panic disorder, bipolar disorder, and post-traumatic stress disorder with depersonalization.

¶ 13    The State filed a response, and the motion proceeded to a hearing on April 21, 2022. At the hearing, defendant introduced her medical records from the Ecker Center in Elgin, the Du Page County Jail, and the Illinois Department of Corrections. The State introduced recordings of phone calls defendant made while in jail between January 13 and January 19, 2019.

¶ 14    Relevant here, defendant's IDOC medical records included documents from Logan Correctional Center: (1) a May 14, 2019, mental health evaluation signed by Janeen Wright, L.P.C, (2) a June 1, 2019, psychiatric diagnostic evaluation signed by Joy Urubusi, M.D., and (3) various progress notes.

¶ 15    The mental health evaluation indicated that defendant would be diagnosed with panic disorder, bipolar I disorder with mood-congruent psychotic features, antisocial personality disorder, borderline personality disorder, cannabis use disorder ("mild, in a controlled

environment"), and alcohol use disorder ("mild, in a controlled environment"). The evaluation included a note, providing,

> "Possible diagnoses include schizoaffective disorder. More time with the patient would be necessary to complete a thorough diagnosis and rule out/rule in diagnoses based on mood variations that may co-occur with psychotic symptoms the patient presents. This is more difficult given that the patient is not a reliable historian and may be concealing or overinflating some potential diagnostic symptoms due to her delusional, prosecutorial, paranoid, and/or disorganized thinking."

The evaluation also indicated that defendant reported hearing voices beginning around the age of 10 or 12, that she heard voices daily, and that an angry male voice told her to do "bad things." It also noted that defendant "did not mention hearing voices until later in the interview when specifically asked."

¶ 16     The psychiatric diagnostic evaluation indicated that defendant's reporting of symptoms was "Fairly reliable" (in contrast with "Unreliable" or "Reliable"). The evaluation identified her psychiatric DSM diagnoses as "GAD," "PANIC D/O," "Bipolar d/o with pshotic [*sic*] fx vs schizoaffective d/o," and "Substance use d/o." A July 24, 2019, treatment plan also listed her diagnosis as "GAD; Bipolar d/o with psychotic fx" and listed two medications: Geodon (for psychosis) and Paxil (for anxiety). Subsequent progress notes consistently listed the same, and a December 4, 2019, progress note provided, "Panic Disorder First Observed 11/6/2019 03:41 PM."

¶ 17     At the hearing on her motion to withdraw her guilty plea, defendant testified that she began to suffer from anxiety attacks in adolescence and that having an attack "just feels like I'm in a dream." She also began experiencing auditory hallucinations in adolescence: "I just hear things,

10

not so pleasant things, sometimes they tell me to do bad things, sometimes it's just, you know, like a man's voice in my head telling me to do stuff that I don't want to do."

¶ 18 Defendant underwent an abortion in June 2017, after which she testified "I was extremely sad and just crying out of my control." Following her July 2017 arrest, she remained in Du Page County Jail for two years and experienced anxiety, panic attacks, and heard voices, but she did not receive any treatment or medication. She testified she did not sleep on the night before her plea hearing due to anxiety; further, she "heard voices just telling me just to take the deal, it's the best you're gonna get. And my public defender at the time, he told me that was the best I was going to get. So I just felt like just take it[.]" The voice was angry and male. She wanted to accept the State's plea offer "just to get it over and done with."

¶ 19 When her case was called, she experienced "[a] slight panic attack." She recalled being asked questions by the court and giving answers, "but it was just kind of hard for me to focus on what was going on. I just—to me it just felt like a dream." The court's questions "kind of just sound like just noise, so I just agreed to everything." She also said she accepted the plea because "my public defender said if I didn't take the plea deal, then new charges would be brought upon me."

¶ 20 Defendant denied that she fully understood all aspects of her plea and the court's admonitions and that her plea was voluntary. Further, she asked her attorney about her mental problems, but her attorney "just kind of brushed it off."

¶ 21 On cross-examination, the State questioned defendant about various phone calls with relatives. Defendant recalled speaking to her grandmother on the afternoon of January 17, 2019, and with her mother the following day. Both her mother and grandmother were upset that she accepted the plea and indicated she should not have done so. Defendant said she did not recall the

11

court explaining the range of penalties for the charges or the State discussing the terms of the agreement, but she did recall hearing the State's recommendation of 28 years imprisonment. Defendant also testified, "I just said yes to everything" and "It was all a blur to me."

¶ 22   Nansi Angelopoulos, a mental health clinical consultant at the Du Page County Public Defender's Office, testified that she conducted a clinical assessment of defendant after interviewing her for approximately two hours on December 2, 2021, and reviewing defendant's social history and a clinical analysis. Angelopoulos diagnosed defendant with panic disorder, bipolar disorder with psychosis, and posttraumatic stress disorder with depersonalization.

¶ 23   Angelopoulos defined panic disorder as "a recurring kind of fearful burst of panic attacks" and explained that defendant reported her symptoms as increased raised heart rate, tightness in her chest, and sweaty hands. She described bipolar disorder as characterized by manic and depressive episodes—a manic episode is "a surge of irritability, lots of energy, lack of ability to sleep at times" while a depressive episode is "more of just sadness, the tearfulness, the negative thought process and at times suicidal[.]" She characterized posttraumatic stress disorder as a negative sense of self and future that follows traumatic experience, with a feeling of detachment from others, and explained that depersonalization occurs when a person has a recurrent detachment from mind or body. She agreed that describing one's personal experience as a dream is consistent with depersonalization. She noted that defendant's social history indicated she had been suicidal "a few times."

¶ 24   Angelopoulos also testified that defendant told her she experienced an increase in auditory hallucinations following her June 2017 abortion, which occurred more during the week leading up to the guilty plea hearing, and slept six hours the night before her court date. Defendant did not describe her experience in court as dreamlike, however. Regarding defendant's medications, she

explained that Geodon is typically prescribed for bipolar (and classified as an antipsychotic) while Paroxetine (Paxil) is typically prescribed for anxiety and depressive symptoms.

¶ 25    The trial court gave its oral ruling on May 5, 2022. The court explained it reviewed relevant case law, defendant's amended motion to withdraw her guilty plea, defendant's affidavit, the State's response, the exhibits entered at the hearing, the transcript of the plea hearing, and the current testimony. As a threshold matter, the court found "overall there's credible evidence that at various times in the defendant's life she has experienced mental health issues" which "included panic attacks, sleep difficulty, for want of a better word, and apparent auditory hallucinations or hearing of voices." The court noted, however, that defendant did not report hearing voices until May 2019 while in IDOC and she agreed she did not report hearing voices while in the Du Page County jail.

¶ 26    The court first discussed the contents of defendant's January 2019 phone calls that were introduced by the State:

"I looked at evidence of the jail calls that were presented into evidence to see if there was evidence there that could reasonably be construed that there were voices telling the defendant to plead guilty. I listened to all those jail calls.

First, there's no mention or any reference to any voices or other such experiences that were influencing the defendant to plead guilty. She talked on those calls to various people; her mother, her grandmother, I believe her brother was one of them. Certainly that topic never came up; it was never referenced.

She testified that the day before the plea of guilty she heard the voices to take the deal, it's the best I can get; it was a man's angry voice the day before the plea of guilty. So I looked at the jail calls on January 16th, the day before the plea of guilty. She discussed

13

with the person on the phone getting the State's offer in October of 14 plus 14 equaling 28 years for attempt murder and arson. She mentioned that it's 85 percent, at least one of those was at 85 percent.

She said on the jail call, again, she mentioned the October offer, that being the first offer and stated, quote, I'm going to take it. And she stated she thinks maybe the State will come down from that offer. She states, quote, I'm kind of undecided.

She asked the person on the phone, should I wait for a better offer? I'm debating, quote, I'm debating.

The October offer—she states later in the call, the October offer is the first offer after 14 months in the jail; do you think the State will come down?

She testified at the hearing that I knew I wanted to take the deal to get it over with; I didn't want to wait in the bullpen anymore. And on jail call on January 17th, the date of the plea I believe with her grandmother she stated, quote, I decided to take it; I've been thinking about it all day, quote, and I'm, quote, going to take the 28 today, end quote.

Certainly my interpretation of these calls when she's saying contemplating taking it, saying she's undecided, saying she's still debating, saying maybe there's an option of a lower offer, that is completely inconsistent with some angry man's voice telling her this the best deal you can get, you better take it. I just don't see that at all as evidence from these phone calls the day before the plea. Everything she said seemed to indicate to me that this was her decision, that she was thinking about it and weighing it and deciding what to do and nothing was commanding her to do one thing or the other."

The court then discussed defendant's behavior at the guilty plea hearing. The court noted that defendant expressly stated she was agreeing to "two counts for 14 years consecutive, total of 28

14

years," which the court characterized as an affirmative statement, adding, "She answered a lot more than just yes." Similarly, when asked if she understood her rights to plead not guilty and proceed to trial, defendant stated, "I understand I'm waiving those rights." Moreover, defendant replied "no" several times; specifically, when asked if she had been coerced, if anyone had made any promises to her, and if she was then taking any medication.

¶ 27    The court concluded that the phone calls and defendant's responses to the court's admonishments during the plea hearing were "inconsistent with any voice telling her she had to plead guilty." It further concluded that defendant "didn't just say yes to everything" despite defendant's testimony that she "just agreed to everything." Rather, "She gave more expansive answers and some questions she said the word 'no' to." Accordingly, the court denied defendant's motion to withdraw her guilty plea.

¶ 28    This timely appeal followed.

¶ 29                                    II. ANALYSIS

¶ 30    Defendant argues the trial court abused its discretion when it denied her motion to withdraw her guilty plea. She claims that, as a result of her mental illness, she experienced auditory hallucinations and perceived the plea hearing as a dream; as a result, her agreement to plead guilty was not knowing, voluntary, or intelligent. Further, defendant contends counsel provided ineffective assistance when counsel declined to argue that the trial court violated Rule 402(a)(2) by failing to admonish her of the possibility she would be required to pay restitution.

¶ 31                A. The Trial Court's Denial of Defendant's Amended

                        Motion to Withdraw Her Guilty Plea

¶ 32    Generally, the decision to grant or deny a motion to withdraw a guilty plea is reviewed for an abuse of discretion. *People v. Hughes*, 2012 IL 112817, ¶ 32. To satisfy due process, a guilty

plea must be made intelligently and voluntarily. U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 2; *People v. Burt*, 168 Ill. 2d 49, 64 (1995) (citing *Boykin v. Alabama*, 395 U.S. 238 (1969)). A defendant seeking to withdraw a guilty plea must show manifest injustice in that (1) the plea was entered because of a misapprehension of the facts or law or (2) there is doubt as to the defendant's guilt and justice would be better served through a trial. *Hughes*, 2012 IL 112817, ¶ 32.

¶ 33        Defendant does not argue that there is doubt as to her guilt such that justice required allowing her to withdraw her plea, thus her claim depends on a showing that she misapprehended the facts or the law. In support, defendant argues she could not have understood the consequences of her plea agreement because, due to the mental illnesses she suffered at the time of the plea, she was detached from reality and did not understand what was happening.

¶ 34        Specifically, defendant first contends she suffered from a sudden panic attack at the onset of the plea hearing and she did not sleep the night before. At the post-remand hearing on her motion to withdraw her plea, defendant testified that the plea hearing "felt like a dream." She could "barely" recall being asked questions by the court and giving answers, and the court's questions "kind of just sound[ed] like just noise, so [she] just agreed to everything." She notes that Angelopoulos testified her reported symptoms were consistent with the DSM criteria for panic disorder.

¶ 35        Defendant testified she remembered the court asking various questions and responding to those questions, but she "just said yes to everything." She did not recall the court telling her the range of penalties for the charges, the State discussing terms of the plea agreement, the court asking if, knowing her rights, she wished to continue her plea, or the court asking if she was entering her plea freely and voluntarily. She was not medicated at the time of the plea, but was later prescribed Paxil, Geodon, and Hydroxyzine (for anxiety and psychosis). Defendant further argues, "The

16

court's findings failed to consider [that defendant] was unwilling to talk about the voices unless specifically asked about them due to her fear that discussing the voices would anger them, a fear so pronounced that mentioning the hallucinations brought her to tears."

¶ 36    Defendant likens the facts of her case to *People v. Hiatt*, 2018 IL App (3d) 160751, in that, like the defendant in that case, she was suffering from mental illness and did not ask any questions at the hearing or "utter any words not commonly found in plea hearing transcripts." She argues this demonstrates that she did not understand the consequences of the plea agreement.

¶ 37    In *Hiatt*, the defendant agreed to plead guilty to three counts of unlawful delivery of cannabis. He was released on his own recognizance, but the State later requested that the trial court revoke his recognizance bond. The court granted the State's request, issued an arrest warrant, and sentenced the defendant *in absentia*; the defendant was later arrested in Florida and extradited to Illinois. The defendant thereafter filed a postconviction petition asserting that trial counsel rendered ineffective assistance in that counsel failed to investigate the defendant's mental state, and this failure prejudiced the defendant because he was unfit to plead guilty.

¶ 38    The trial court granted the petition and vacated the guilty plea, and the State appealed. The appellate court affirmed the trial court's order because the evidence showed a *bona fide* doubt as to the defendant's fitness at the time he pled guilty; accordingly, the trial court's decision was not manifestly erroneous. *Hiatt*, 2018 IL App (3d) 160751, ¶¶ 1, 19, 27. While noting the defendant had been diagnosed with depression, anxiety disorder, psychosis, PTSD, OCD, and ADHD, the court reasoned that his claimed inability to understand the plea proceedings were supported by subsequent conduct:

"This lack of understanding is evident in his petition in which he stated that he believed he would be 'employed as a [D]rug Enforcement Agent, assigned to apprehend any Drug Lord

17

or his conspirators/co-conspirators' and would become a police officer like he saw on television if he accepted the plea agreement. Subsequently, defendant went to Florida to 'follow[ ] a flow of drugs from Rock Island to Florida' and set up individuals conducting drug activity. He did not know anyone in Florida and continued to 'stay[ ] on the streets' until he was arrested. The trial court found defendant to be credible." *Id.* ¶ 27.

The defendant in *Hiatt* thus presented credible evidence of erratic behavior that supported his claimed inability to understand the plea proceedings.

¶ 39    Here, while defendant presented evidence that she suffered from mental illness at the time of her plea, she did not present evidence of erratic behavior to support her claim that her mental illness actually rendered her unable to understand the plea proceedings. Her claim is supported only by her subsequent diagnoses and her bare assertion that she could not understand the plea proceedings. This assertion was undercut by the May 14, 2019, mental health evaluation, which noted that defendant "did not mention hearing voices until later in the interview when specifically asked," and by Angelopolous, who testified that, during their interview, defendant did not describe her experience in court as dreamlike. Angelopolous also reported that defendant told her she slept six hours the night before her court date, in contrast with defendant's testimony that she did not sleep at all that night.

¶ 40    Moreover, the State offered affirmative evidence that defendant *could* understand the proceedings via contemporaneous phone calls with family in which she carefully considered the State's plea offer. The trial court relied on those phone calls in discounting defendant's claim that voices told her to plead guilty:

"Certainly my interpretation of these calls when she's saying [she's] contemplating taking it, saying she's undecided, saying she's still debating, saying maybe there's an option of a

18

lower offer, *that is completely inconsistent with some angry man's voice telling her this the best deal you can get, you better take it*. I just don't see that at all as evidence from these phone calls the day before the plea. Everything she said seemed to indicate to me that this was her decision, that she was thinking about it and weighing it and deciding what to do and nothing was commanding her to do one thing or the other." (Emphasis added.)

"A reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of witnesses." *People v. Jones*, 2023 IL 127810, ¶ 28. We thus conclude *Hiatt* does not support defendant's position.

¶ 41    The record further supports the trial court's finding that defendant did not simply agree to everything at the plea hearing. At the hearing, defendant explicitly acknowledged the sentence the State recommended ("Yes, two counts for 14 years consecutive, total of 28 years."). This response echoed defendant's discussion of the State's offer in the January 16, 2019, phone call referenced by the court. She gave several other responses at the plea hearing that indicated more than just agreement, including "I understand I'm waiving those rights," "I understand," and, several times, "No." Taken together, the phone calls and defendant's responses rebut her assertion that she did not understand what was happening.

¶ 42    Defendant nevertheless argues that her claim about the symptoms she experienced at the plea hearing was supported by Joy Urubusi, whose June 1, 2019, psychiatric diagnostic evaluation indicated that her reporting of symptoms was "Fairly reliable" (in contrast with "Unreliable" or "Reliable"). Defendant cites this report to rebut any concerns that the trial court found she was lying about her symptoms. But the trial court explicitly found that "overall there's credible evidence that at various times in the defendant's life she has experienced mental health issues." Moreover, the May 14, 2019, mental health evaluation prepared by Janeen Wright indicated that

19

defendant "is not a reliable historian and may be concealing or overinflating some potential diagnostic symptoms due to her delusional, prosecutorial, paranoid, and/or disorganized thinking." This evaluation undercuts defendant's claims about the reliability of her own reporting of symptoms.

¶ 43    Unlike the defendant in *Hiatt*, defendant also contends she suffered from schizoaffective disorder, but her citations to the record do not support this contention. In fact, the May 14, 2019, evaluation merely indicated that that was a "[p]ossible diagnos[i]s" and, as noted above, defendant may have been exaggerating her symptoms. The report further indicated that "[m]ore time with the patient would be necessary to complete a thorough diagnosis and rule out/rule in diagnoses based on mood variations that may co-occur with psychotic symptoms the patient presents." More than two years had elapsed between that evaluation and the hearing on her motion to withdraw her guilty plea, yet defendant offered no evidence of any subsequent evaluation with a schizoaffective disorder diagnosis.

¶ 44    For these reasons, we conclude defendant failed to show her plea was not made intelligently and voluntarily. We cannot say the trial court abused its discretion when it denied defendant's motion to withdraw her guilty plea.

¶ 45                    B. Ineffective Assistance of Counsel

¶ 46    Defendant also argues counsel provided ineffective assistance with respect to her amended motion to withdraw her guilty plea by failing to argue that the trial court violated Illinois Supreme Court Rule 402 (eff. July 1, 2012) where it did not admonish her that, by entering a guilty plea, she could be required to pay restitution. A defendant is entitled to the effective assistance of counsel. U.S. Const. amends., VI, XIV; Ill. Const. 1970, art. I, § 8. To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel and

20

(2) resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). To establish deficient performance, "[a] defendant must overcome 'the strong presumption that counsel's performance fell within [the] wide range of reasonable professional assistance.' " *People v. Stevenson*, 2020 IL App (4th) 180143, ¶¶ 18, 21 (quoting *People v. Palmer*, 162 Ill. 2d 465, 476 (1994)) (concluding there was "no clear or obvious error in the [trial court's] Rule 402(a) admonitions" where the defendant's claim of error was "debatable").

¶ 47    The State concedes that the trial court failed to strictly comply with Rule 402(a)(2) in that it did not explicitly admonish defendant as to restitution. Nevertheless, "It is well settled that Rule 402 requires substantial, not literal, compliance with its provisions." *People v. Dougherty*, 394 Ill. App. 3d 134, 138 (2009) (citing *Burt*, 168 Ill. 2d 49 (1995)). " 'Substantial compliance' means that although the trial court did not recite to the defendant, and ask defendant if [s]he understood, all the components of Rule 402(a), the record nevertheless affirmatively and specifically shows that the defendant understood them." *Id.* (citing *People v. Walker*, 109 Ill. 2d 484 (1985)). Failure to admonish a defendant as to a specific provision is not fatal if "the defendant understandingly and voluntarily entered [her] plea[.]" *Id.*

¶ 48    We conclude that defendant cannot satisfy her burden to show ineffective assistance of counsel because the trial court substantially complied with Rule 402(a)(2). At the plea hearing the State set forth the terms of the fully negotiated agreement and clearly indicated that the agreement included restitution. The exact amount of restitution was not yet known, however, requiring a continuance for entry of the sentence. The State further explained that the agreement would include entry of an unsatisfied judgment as to the restitution amount. After the State's recitation of the agreement, the court had defendant confirm that she understood the agreement as explained by the State and she was agreeing to those terms. Further, defense counsel confirmed that imposition of

the sentence was dependent upon ascertaining the amount of restitution, stating, "I think primarily we were waiting on the restitution figures and any victim impact statements, so however long it would take the State."

¶ 49 Considering the plea hearing in its entirety, defendant was fully aware that her negotiated sentence included restitution. Thus, the trial court substantially complied with Rule 402(a) and counsel's failure to raise this issue was not ineffective assistance of counsel.

¶ 50 Defendant's reliance on *People v. Wigod*, 406 Ill. App. 3d 66, 76 (2010), is unavailing. In *Wigod*, the defendant entered a blind plea of guilty to the charge of failure to support following a continuance in his bench trial. The appellate court summarized the plea proceeding as follows:

"After ascertaining defendant's desire to change his plea, the trial judge stated:

'You are charged in this case with a crime of failure to support. That is a Class 4 felony. What that means is when you plead guilty, then it will be up to me to sentence you anywhere from probation up to time in the penitentiary, anywhere from a minimum of one year up to a maximum of three years, and that would carry one year of mandatory supervised release which is what they used to call parole.'

Defendant indicated he understood and changed his plea to that of guilty. The trial judge then admonished defendant as to the rights he was giving up by changing his plea. The judge added: 'And you understand that I have the realm to sentence you to any of *those possible sentences*, do you understand that.' *** Defendant indicated that he did." (Emphasis in original.) *Wigod*, 406 Ill. App. 3d at 68.

The court went on to sentence the defendant to 18 months' imprisonment and ordered him to pay restitution totaling $85,802. On appeal, the defendant argued he was improperly admonished as to the possibility of being ordered to pay restitution. The court concluded that the defendant was

inadequately admonished as to the full extent of the penalties available to the trial judge in sentencing, thus he could have "clearly misinterpret[ed] the admonishment he received as removing restitution from the table." *Wigod*, 406 Ill. App. 3d at 75-76.

¶ 51 *Wigod* is readily distinguishable because, as discussed above, the record refutes the notion that defendant could have misinterpreted the admonishments she received as removing restitution from the table. The State twice stated at the plea hearing that the plea agreement included an unsatisfied judgment as to restitution, the amount of which would be determined at a later date, and defendant testified that she heard the State go through the terms of the agreement and understood she was agreeing to those terms. After her plea was accepted, defendant's counsel specifically noted that the case needed to be continued for receipt of the restitution amounts. Defendant was fully aware that her negotiated plea included an unsatisfied judgment as to restitution.

¶ 52 The trial court substantially complied with Rule 402(a)(2) at the plea hearing. Counsel's failure to raise that issue fell within the wide range of reasonable professional assistance. Defendant thus fails to establish deficient performance by counsel.

¶ 53                                III. CONCLUSION

¶ 54 For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 55 Affirmed.

¶ 56 JUSTICE McDADE, specially concurring:

¶ 57 I agree with the majority that the defendant failed to effectively show her attorney rendered ineffective assistance and concur completely with that part of the decision.

¶ 58 With regard to the portion of the order that discusses whether defendant's mental health issues affected the validity of her plea, I concur but only because the record does not affirmatively

establish an abuse of the trial court's discretion. Given the state of the record, we assume he knew and enforced the law. I write separately, however, to point out that the record also does not affirmatively show either that the trial judge is a trained psychologist or psychiatrist or that he had or solicited a professional opinion that defendant's conduct at the sentencing hearing was inconsistent with her mental diagnosis. It would instill more confidence in the outcome of this case had the trial court not acted in the absence of knowledge it does not appear of record it had.